THE ADIRONDACK RECORD, INC., Respondent, *v*. GEORGE LAWRENCE and Others, Appellants.

Third Department, July 6, 1922.

Libel — complaint by corporate proprietor of newspaper alleging circulation of handbill ridiculing editor and accusing him of corruption, immorality and hypocrisy, but alleging no special damages, does not state cause of action — charges in article relating to corporation itself necessary to sustain such complaint.

A complaint in an action for libel brought by the corporate proprietor of a newspaper alleging the circulation of a libelous handbill, but alleging no special damages, does not state a cause of action, where it appears that the statements in the handbill, as set forth in the complaint, consist of a personal attack on the editor of the newspaper, charging him with corruption, immorality and hypocrisy, but entirely with reference to his personal mode of living and not with reference to his management of the newspaper.

To sustain such a complaint, the article alleged to be libelous must contain some charge or statement in relation to the corporation itself as distinguished from its editor and which necessarily and directly affects its credit and occasions pecuniary injury.

COCHRANE, P. J., and KILEY, J., dissent.

APPEAL by the defendants, George Lawrence and others, from an order of the Supreme Court, made at the Essex Special Term and entered in the office of the clerk of the county of Essex on the 11th day of March, 1922, denying their motion to dismiss the complaint, made under rule 106 of the Rules of Civil Practice, upon the ground that it did not state facts sufficient to constitute a cause of action, and also from an order of said court, made at

the same term and entered in said clerk's office on the same day, denying their motion to compel the plaintiff to make the complaint definite and certain, and also to strike therefrom, as redundant and irrelevant, certain matters, or in the alternative, to separately state and number certain allegations therein.

The plaintiff is a corporation. The complaint is to recover damages suffered by reason of the publication of an alleged libelous handbill. It alleges that the plaintiff corporation is the owner and publisher of a newspaper known as *The Adirondack Record,* having a large circulation in Ausable Forks, N. Y., and in several nearby counties; that its paper was enjoying the confidence and respect of subscribers, patrons and citizens generally where circulated; " that the prosperity, usefulness and permanency of the plaintiff were and are dependent upon the honesty, skill and ability of the management of the plaintiff and upon the truthfulness and reliability of the items of news published in plaintiff's newspaper and upon the confidence of the public in such honesty, skill and ability and such truthfulness and reliability; " that the defendants " for the purpose of injuring the credit and business of the plaintiff and to destroy the confidence of plaintiff's subscribers and citizens generally, caused to be composed of and concerning the plaintiff a certain handbill or poster containing false, defamatory and libelous matter concerning the plaintiff and affecting the business character and credit of said plaintiff as follows:

" ' THE RECORD'S RELIABILITY.

" ' The Adirondack Record has published a very pretty little article about the class of entertainments that the Bridge Theatre is furnishing its patrons, especially the one given on Friday evening, December 26, which they say has not been equaled for true degeneracy and filthiness in a very long time. Now, we wish to say that if any one would like to know something about filth and degeneracy, they need not wait for the evening and the Theatre but call on the Editor of the *Record* at any time and listen to the stories of himself.

" ' We would like very much to have them explain the meaning of the word ' profanity,' also, as the term LIAR was the nearest thing to profanity that was used during the so-called entertainment, and if that is classed as profanity, in the *Record's* dictionary, we would like to get a copy.

" ' The item regarding the Chairman of the Red-Cross offering to referee a fight between the parties who were quarreling must have been inserted to help fill up the columns, or as a sample of the *Record's* news, as the person referred to was in New York City

at the time, and did not learn of the trouble until he saw the brilliant talk in the *Record.*

" ' In a recent issue of that ably (?) edited sheet, *The Adirondack Record* — under the        of December 26, we believe this ' great ' reformer, or performer, referred to ' that terribly corrupt town of Black Brook ' and to its citizens as bootleggers, and to the town authorities as incompetents.

" ' All you have to do is to listen to this actor a few minutes and you will realize that his hat covers the worst corruption in the entire town.

" ' Again listen to him, and you will learn from his own lips that he is a ' booze fighter,' gambler and immoral man. Yet this hypocrite every time he hears of any one using a little ' fire water,' as he calls it, or perhaps committing some little offense, he rushes into print to vilify the party; when, as a matter of fact, judging from what he says, he punishes more ' fire water ' than any ' gutter pup ' was ever known to.

" ' This great apostle of prohibition said that he attended a meeting of the Board of Supervisors at Elizabethtown recently, and upon his return, he told anybody that wanted to listen to him, that ' at a certain dinner, we paid Ben Stetson $235 for whiskey.' This may be so, and may not; however, Moral Ben, do not trust any low grade talking machines. A slight jar sometimes set these self-winders off and they tell things.

" ' We would suggest to this hypocrite that if he wants to publish a real sensational story something that would eclipse anything that he has ever printed along the lines of degeneracy and filthiness — to devote several columns about himself every week for the year 1920. You cannot camouflage the people.

" ' In conclusion we wish to say that the most of the representative citizens of Ausable Forks unite in saying that if the *Record's* chief representative could be treated to a ride out of town on a fence rail with a nice coat of tar and feathers as wearing apparel, it would be as good a thing as could happen to the town; ' " that the defendants caused many copies of said handbill to be printed and circulated in the counties where the newspaper published by the plaintiff was circulated; and " That by means of such publication the plaintiff was injured in its reputation, credit and good name and suffered the loss of public confidence and respect to its damage of ten thousand ($10,000.00) dollars."

*Weeds, Conway & Cotter* [*Frank E. Smith* and *Thomas B. Cotter* of counsel], for the appellants.

*Patrick J. Tierney,* for the respondent.

HINMAN, J.:

It has been proved to the satisfaction of this court that the article in question was libelous so far as the editor of the plaintiff's paper was concerned. (*McKee* v. *Robert,* 197 App. Div. 842.) We are now asked to say whether the complaint states a cause of action for libel against the corporation which owns and publishes the paper. The principles involved seem to be well settled and reiterated by the Court of Appeals in *First National Bank* v. *Winters* (225 N. Y. 47), citing *Reporters' Assn.* v. *Sun Printing & Publishing Assn.* (186 N. Y. 437) and *New York Bureau of Information* v. *Ridgway-Thayer Co.* (119 App. Div. 339, 342; revd. on dissenting opinion, 193 N. Y. 666).

In *Reporters' Assn.* v. *Sun Printing & Publishing Assn.* (*supra,* 440) the Court of Appeals said: " That a corporation has the right to maintain an action of libel when the publication assails its management, or credit, and inflicts injury upon its business, or property, is a proposition which is true upon principle and which has the support of authority. * * * It is as much entitled to the protection of the law, in those respects, as is the natural person. It differs from the latter in that it has no character to be affected by a libel; but its right to be protected against false and malicious statements affecting its credit or property should be beyond question. There has been some dispute in the cases as to the necessity of setting out the specific damage which a corporation claims to have suffered from a libelous publication; but I regard the better rule to be that such an averment is not necessary when the language is of so defamatory a nature as to directly affect credit and to occasion pecuniary injury."

In *New York Bureau of Information* v. *Ridgway-Thayer Co.* (*supra,* at p. 344 of the opinion adopted by the Court of Appeals) it is said: " The object of requiring that special damage be alleged in an action of this kind is to restrict the recovery to actual pecuniary loss. When the libel is of such a character that such loss will necessarily flow from its publication, then such damage will be presumed; otherwise it must be alleged. Where a libel is published of an individual affecting his character a recovery is allowed in the absence of proof of special damage, because the nature of the injury is such that the specification of the damage is impossible; but as the only injury that can be sustained by a business corporation is the pecuniary damage that is actually sustained because of the publication, such special damage must be alleged unless from the nature of the libel pecuniary damages necessarily followed."

In *South Hetton Coal Co.* v. *North-Eastern News Association* (L. R. [1894] 1 Q. B. 133), cited by the Court of Appeals in the *Winters*

*Case (supra),* and which is a leading English case, it is said: " The words complained of must attack the corporation or company in the method of conducting its affairs, must accuse it of fraud or mismanagement, or must attack its financial position." A corporation cannot maintain an action for slander or libel upon words spoken or published solely of and concerning its officers or members. (*Hapgoods* v. *Crawford,* 125 App. Div. 856; *Brayton* v. *Cleveland Special Police Co.,* 63 Ohio St. 83; *Memphis Telephone Co.* v. *Cumberland Tel. & Tel. Co.,* 145 Fed. Rep. 904.) " To merely attack or challenge the rectitude of the officers or members of a corporation, and hold them or either of them up to scorn, hatred, contempt, or obloquy for acts done in their official capacity, or which would render them liable to criminal prosecution, does not give the corporation a right of action for libel." (*Warner Instrument Co.* v. *Ingersoll,* 157 Fed. Rep. 311.)

To sustain this complaint, therefore, the article alleged to be libelous must contain some charge or statement in relation to the corporation itself as distinguished from its editor and which necessarily and directly affects its credit and occasions pecuniary injury, since no special damage has been alleged.

It is well established that the article in question must be construed as a whole. " The language used is to be understood by judge and jury in the same manner as others understand it, and words are to be taken in that sense which would be naturally conveyed to persons of ordinary understanding." (*Morrison* v. *Smith,* 177 N. Y. 366, 368.) " If the article be susceptible of only one meaning, then the question whether or not it is libelous *per se* is to be decided as matter of law by the court." (*Klaw* v. *N. Y. Press Co., Ltd.,* 137 App. Div. 686, 688.) " If the application or meaning of the words is ambiguous, or the sense in which they were used is uncertain, and they are capable of a construction which would make them actionable, * * * it is for the jury to determine upon all the circumstances, whether they were applied to the plaintiff, and in what sense they were used." (*Sanderson* v. *Caldwell,* 45 N. Y. 398, 401.)

Taking the article as a whole and reading it in the sense which would be naturally conveyed to persons of ordinary understanding, we think it is susceptible of only one meaning, an attack upon the editor alone involving essentially a charge of hypocrisy in his attack upon the defendants, which we have held in *McKee* v. *Robert* (*supra*) to have been defamatory and libelous. The application and meaning of the article is not ambiguous. The sense in which the article is written is not uncertain. It was clearly applied to the editor in the sense of charging him with personal moral tur-

pitude inconsistent with his personal authorship of articles reflecting on people guilty of failings and little offenses. It is a charge of mismanagement of himself in his own personal mode of living, inconsistent with the thoughts to which he gave expression in the publication of the article concerning the defendants, and not a charge of mismanagement of the publication itself by the printing of false, filthy and degenerate facts.

A study of the article by paragraphs, *seriatim*, shows this to be the necessary implication. The heading of the article is " The Record's Reliability." This, standing alone, is not libelous *per se*. To determine whether this heading imputes unreliability, and that the word " reliability " was used in sarcasm as applied to the corporation, no such meaning can be attributed to it unless such imputation is justly found from a perusal of the article as a whole. The controversy, as we shall see, was entirely with the editor.

The learned court below has sustained the complaint apparently on two grounds: (1) That the alleged libelous article charges or is susceptible of having charged the plaintiff corporation with having published in its paper an article relating to the Bridge Theatre which was filthy and degenerate and as such had not been equalled in a very long time; (2) that libleing the editor of a newspaper in the manner in which this editor was libeled is libeling the corporation which employs the editor and publishes the paper.

In the first ground, the learned trial justice is clearly in error. No such meaning can fairly be attributed to the 1st sentence of the 1st paragraph of the article. It is not ambiguous or uncertain or susceptible of the construction which he places upon it. It is a mere recital of the account in the *Record* which gave rise to the alleged defamatory article. Giving effect to the words " they say," the only construction to be given to the sentence is that the writer calls attention to the fact that the *Record* has published an article accusing the Bridge Theatre of giving an entertainment which was filthy and degenerate. It is the opening sentence, merely introductory in character, the occasion or attempted justification of the counter charges to follow. It is not a charge at all, either against the corporation, its paper or its editor. It is a mere statement in substantial reiteration of the language used in plaintiff's own paper. The balance of the 1st paragraph relates solely to the editor. Calling on him and listening to his stories of himself does not indicate in any way that such stories are printed in the *Record*.

The 2d paragraph is a discussion of what constitutes " profanity " and at most constitutes a legitimate criticism. The use of the word " them " does not relate to the corporation and the editor. The customary use of the editorial " we " encourages the use of the

editorial " them " in a reverse situation where reference is clearly had, as in this case, to the editor.

The 3d paragraph refers to the same article printed in the *Record* which constituted the source or occasion for the writing referred to in the opening sentence which we have considered. . The 3d paragraph refers to what the *Record* had said about the chairman of the Red Cross offering to referee a fight between the parties who were quarreling, whereas attention is called to the fact that the person referred to was in New York city at the time. This charge standing alone in an article otherwise woven around the editor alone must have been understood as a charge aimed at the editor and moreover, if true, was a legitimate criticism.

The next paragraph constitutes a criticism of another recent article appearing in the *Record,* relating to the town of Black Brook. This must be read with the paragraph which follows it and so read it can have but one meaning, a charge of hypocrisy against the editor. No attempt is made to justify the town, or its citizens or the town authorities against the charges of corruption, or incompetency, nor even to question the truthfulness of such charges alleged to have been made by the *Record.* It is clearly an attempt to make an unfavorable comparison between the things charged by the editor and the things of which he himself was susceptible to charges in the matter of corruption.

The next paragraph simply purports to charge hypocrisy against the editor. The article does not charge him with improper management and use of the paper to " vilify " others in the sense of publishing libel against others. The context clearly indicates that the writer must be understood as saying that this hypocrite rushes into print to reveal to the public that which is vile, base or degrading in the conduct of others whenever he hears of some little offense which has in fact been committed, whereas one so unclean, base and odious himself ought not to criticize others for their petty weaknesses.

The next paragraph is clearly personal to the editor as is likewise the last paragraph of the article.

The next to the last paragraph indicates that the editor has printed in his newspaper sensational stories " along the lines of degeneracy and filthiness." Here again the writer is only quoting the language of the editor in his charge against the Bridge Theatre in the 1st paragraph of the alleged libelous article. The charge is made against him. The language used does not attribute degeneracy and filthiness to the articles written by him but accuses him of charging others with such qualities, as he did the Bridge Theatre,

17

objection being raised only to such publication at the hand of a man who could tell worse stories about himself. The suggestion that he print such stories about himself cannot be understood as meaning that the corporation would permit its paper to be put to such disreputable use.

The other ground of the decision below is that libeling the editor of a paper by accusing him of being a hypocrite, a drunkard, a gambler, etc., necessarily affects the business of the corporation, to its financial loss, which owns the paper and employs the editor. We think otherwise, under the authority of *Hapgoods* v. *Crawford* (*supra*) and the other cases to which we have referred. If any recovery were to be permitted in such a case, it should be upon proper allegation of special damage. The gist of the charge against the editor is his mismanagement of himself and not his mismanagement of the *Record*. We cannot see how such a charge necessarily works pecuniary loss by the corporation. (*Kemble & Mills* v. *Kaighn*, 131 App. Div. 63, 65.) If any special damage has been occasioned, it should be fully and accurately stated in the complaint. (*Reporters' Assn.* v. *Sun Printing & Publishing Assn.*, *supra*.) Moreover, if there was any libel other than in relation to the editor, it related to a newspaper rather than its corporate owner and we have authority to sustain our conclusion that in such a case special damages should be alleged. (*Le Massena* v. *Storm*, 62 App. Div. 150. See, also, *Marlin Fire Arms Co.* v. *Shields*, 171 N. Y. 384; *Kennedy* v. *Press Pub. Co.*, 41 Hun, 422.) In *Le Massena* v. *Storm* (*supra*, 154) the court said: " Under the authorities, we are of the opinion that these slanderous words were more in the nature of a slander of a newspaper than of the plaintiff. When the slander is of a property right or title, or of a thing, falsity of utterance, malice and special damages flowing or resulting necessarily or naturally as the proximate consequence must be alleged and shown by the plaintiff, except in those cases where the slanderous words also impute to the owner dishonesty, fraud, deception or other misconduct in his trade or business in connection with the property."

The motion to dismiss the complaint for failure to state a cause of action should have been granted.

It is not necessary to pass upon the merits of the other motions passed upon by the court below as represented by the other order appealed from, in view of our decision that the complaint should be dismissed.

The order denying the motion to dismiss the complaint should be reversed, with ten dollars costs and disbursements, and the motion to dismiss the complaint granted, with ten dollars costs, with leave

to the plaintiff, within twenty days, to serve an amended complaint on payment of said costs.

All concur, except COCHRANE, P. J., and KILEY, J., dissenting.

Order denying motion to dismiss the complaint reversed, with ten dollars costs and disbursements, and motion to dismiss the complaint granted, with ten dollars costs, with leave to the plaintiff, within twenty days, to serve an amended complaint on payment of said costs.