[Civ. No. 8765.    Fourth Dist., Div. One.    May 3, 1968.]

WATSON WASHBURN et al., Plaintiffs and Appellants, v. DORIS WRIGHT et al., Defendants and Respondents.

Wright & Finley, Dudley K. Wright and Kent G. Snyder for Plaintiffs and Appellants.

Launer, Chaffee & Hanna, Walter B. Chaffee and Walter G. Howald for Defendants and Respondents.

WHELAN, J.—Plaintiffs, as trustees of Reading Reform Foundation, a nonprofit trust declared and existing under the laws of the State of New York, appeal from a judgment of dismissal entered upon an order sustaining without leave to amend a demurrer to their second amended complaint.

The action brought on behalf of Reading Reform Foundation (RRF) sought damages for an alleged libel.

The alleged libelous material appeared as a part of an advertisement published in a newspaper on April 27, 1964, under the caption ''Who is Dr. William V. Lawlor?—What is his interest?'' The caption, in letters 3/8'' high, was followed by 48 lines in small print, among them being the following: ''He serves as executive secretary of Responsibility in Education and the Reading Reform Foundation, both of which are extremist organizations founded by John Birch Society members.''

That paragraph contains the alleged defamatory matter claimed by plaintiffs to be libelous *per se*.

Following the 48 lines of small print was an exhortation in letters ⅜" in height: ''Vote Yes on Recall Tuesday.''

The complaint alleges that RRF: ''. . . has as its purpose to restore the alphabet to its proper place as the basis of elementary reading instruction in English and to improve the method of teaching reading, writing, and spelling in public and private schools, and said foundation is dependent for its income wholly upon contributions, from persons affiliated with the foundation and from the public at large, but said foundation is prohibited by its declaration of trust from carrying on propaganda, or otherwise attempting to influence legislation, or to participate in any political campaign for any candidate for public office and, in fact, said foundation has not violated said prohibition and did not and was not involved in the recall election referred to in the advertisement which is Exhibit 'A' hereto and incorporated herein by reference with the same force and effect as if set forth in full, and Dr.

William V. Lawlor, referred to in said advertisement, was acting in his individual capacity in connection with said recall election and was not acting for or on behalf of or as a representative of said READING REFORM FOUNDATION.''

The complaint contains no other language by way of inducement and no innuendo. It alleges damages, but plaintiffs concede that they have not alleged that RRF suffered special damages within the meaning of section 48a, Civil Code.

The complaint alleges also that a demand for retraction was timely made under section 48a, Civil Code; then alleges: ''Defendants, nor any of them, did not publish a correction of said statements in substantially as conspicuous a manner as the original libelous publication.'' The failure to allege, except by negative pregnant, whether a retraction was in fact printed within the time allowed by the code section was made the subject of a ground of demurrer for uncertainty and ambiguity. If that were the only ground upon which the demurrer had been sustained, opportunity to amend would no doubt have been given.

A sufficient ground for sustaining the demurrer, however, would be that the language complained of was not libelous on its face.

Before passing to a consideration of that question, we note certain other matters that bear upon the sufficiency of the complaint to state a cause of action.

The question of the right of RRF, an unincorporated association, to maintain an action, or to allege a cause of action for defamation, was not raised in the court below.

The question does properly arise, however, in considering whether the complaint states a cause of action: that is whether a cause of action is stated on behalf of RRF as an entity, and whether the complaint states a cause of action on behalf of the individual members of RRF as distinguished from the organization considered as an entity.

The bringing of a class action under section 382, Code of Civil Procedure, on behalf of all members of a voluntary association was held proper in *Jellen* v. *O'Brien*, 89 Cal.App. 505 [264 P. 1115].

We have no way of knowing who are the members of RRF, nor how many of them there are. Conceivably, one or more of them might belong to the John Birch Society; if the label of membership in that society is libelous, any person having dual membership in RRF and the John Birch Society would not have the same right of action as a member of RRF who was

not a member of the Birch Society. For that reason, and because of the language of the complaint, we conclude that such a class action was not intended, but rather an action in which RRF as an entity claims damage to its reputation on which it depends for revenue from voluntary subscriptions.

The right of an association formed under the laws of a sister state to sue in a California court has been recognized, if the laws of the sister state give such right and that right is alleged in the complaint. (*Parks Canal & Min. Co.* v. *Hoyt*, 57 Cal. 44.)

The rule generally accepted is that an unincorporated association has a cause of action for defamation in those circumstances in which a corporation has such a cause of action.

A corporation, even though not engaged in business, being organized for social welfare work, may maintain an action for libel without proof of special damage, where it is dependent for its support on voluntary contributions the number and amount of which are likely to be affected by the publication of which complaint is made. (*New York Soc. etc. of Vice* v. *MacFadden Publications*, 260 N.Y. 167 [183 N.E. 284, 86 A.L.R. 440].) Both California and New York recognize the right of an unincorporated trade union to sue in its own name upon a cause of action for libel (*Kirkman* v. *Westchester Newspapers*, 287 N.Y. 373 [39 N.E.2d 919]; *Daniels* v. *Sanitarium Assn. Inc.*, 59 Cal.2d 602 [30 Cal.Rptr. 828, 381 P.2d 652].)

Thus we come to the problem whether the language complained of is defamatory of RRF as an entity.

It is questionable that the allegedly libelous language could be said to include RRF as well as its founders, in view of the stated rule that: "Words spoken or written of a stockholder or officer give no right of action to the corporation unless spoken or written in direct relation to the trade or business of the corporation. If they relate solely to the stockholder, officer or employee in his private or personal capacity, only the individual can complain. *Brayton* v. *Cleveland Special Police Co.*, 63 Ohio St. 83, 57 N.E. 1085, 52 L.R.A. 525; *Adirondack Record, Inc.* v. *Lawrence*, 202 App.Div. 251, 195 N.Y.S. 627; *Midland Pub. Co.* v. *Implement Trade Journal Co.*, 108 Mo. App. 223, 83 S.W. 298; *Memphis Tel. Co.* v. *Cumberland Tel. & Tel. Co.*, 6 Cir., 145 F. 904; *Willfred Coal Co.* v. *Sapp*, 193 Ill.App. 400, 405, 414." (*Life Printing & Publishing Co.* v. *Field*, 324 Ill.App. 254 [58 N.E.2d 307, 310].) (Cf. *Pollock* v. *Evening Herald Publishing Co.*, 28 Cal.App. 786 [154 P. 30].)

In *Life Printing & Publishing Co.* v. *Field, supra,* the alleged libelous matter asserted that one of the incorporators of an anti-semitic organization was publisher of a newspaper owned and published by the plaintiff corporation. The rule was iterated in the later decision of *Life Printing & Publishing Co.* v. *Field,* 327 Ill.App. 486 [64 N.E.2d 383], in *National Auto. Assn.* v. *Strunk,* 122 Neb. 890 [240 N.W. 294]; *Brayton* v. *Cleveland Special Police Co.,* 63 Ohio St. 83 [57 N.E. 1085]; and *Everett* v. *Gross,* 22 App.Div.2d 257 [254 N.Y.S.2d 561].

In *Life Printing & Publishing Co.* v. *Field, supra,* 58 N.E.2d 307, 311, the following observation was made: "The articles complained of were published to expose and denounce the Gentile Co-operative Association and its founders and promoters. . . . The statements as to the residence of Ferree and his occupation as publisher of Cicero Life were merely incidental and for the purpose of identifying him. On the motion to dismiss and on this appeal these statements must be regarded as untrue. However, there is not the slightest imtimation of any wrongdoing or impropriety of conduct at the alleged residence or in connection with his alleged occupation as publisher of the Cicero Life. Whatever is said derogatory to Ferree is in connection with the Gentile Cooperative Association and his part as an incorporator of it. Nothing is said of Ferree or of Flitcraft in relation to the business of plaintiff corporation, and the publications complained of are not libelous per se as to plaintiff."

The language attributing to the founders of RRF membership in the John Birch Society does not say, and cannot be interpreted as saying, anything concerning the manner of performance by the officers of the RRF of the duties and responsibilities of their office so as to permit the argument that the language charging wrongdoing to the officers has a natural tendency to affect the corporation disadvantageously in its business, which was the situation in *Kirkman* v. *Westchester Newspapers,* 287 N.Y. 373 [39 N.E.2d 919].

According to the Random House Dictionary and the Encyclopaedia Brittanica (1968 ed.),[1] the John Birch Society was founded in December 1958; we have no information as to the time of foundation of RRF.

It is not possible to know from the language of the complaint if the plaintiffs contend that the language used meant that the founders of RRF were at the time of foundation

---

[1]See article on "Conservatism," Encyclopaedia Brittanica.

members of the John Birch Society or that they were then and continued to be such members; or that they had since become and were on the date of publication such members; and if the latter were meant to be understood, if it also was intended to be understood that they continued to be and were at the time of publication acting in RRF.

▇ That uncertainty is not mentioned as going directly to the sufficiency of the complaint to state a cause of action. The demurrer raises no question of uncertainty because of those questions. However, because of the fact that what is averred directly with regard to the John Birch Society has to do ·not with RRF but with its founders, some allegations by way of inducement would be necessary to relate the imputation (assuming there is a defamatory one) to RRF.

The allegations of the complaint asserting the falsity of the alleged libelous matter are consistent with a claim that ·William V. Lawlor was not executive secretary of RRF. No such claim is made elsewhere, and in view of other language of the complaint that Lawlor was acting in his individual capacity and not on behalf of RRF, we assume that he was indeed the executive secretary of RRF.

It is to be noted that RRF is not the direct object of the blast in which the language appears that is objected to; the person whose political standing was under attack was Lawlor, who is referred to in language whose innuendo is anything but flattering. RRF, however, does not complain that its name and reputation are linked with Lawlor, a circumstance which, if untrue, in view of the whole of the advertisement, might seem more properly a subject of complaint than the language actually complained of.

The paragraph in question occupies 5/16 of a linear inch of printing out of a total of 9 inches.

▇ In making that observation, we recognize that the test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text. While a drop of poison may be lethal, weaker poisons are sometimes diluted to the point of impotency. ▇ Accordingly, where the thrust of a written article or advertisement is against a certain person, the fact that a second person is mentioned only incidentally in the article must be considered relevant to the question of actual malice in an action for libel by such second person.

▇ To give a cause of action to plaintiff, the required malice must have been directed against the plaintiff, not against Lawlor.

## The Word "Extremist" as Libelous Per Se

The only direct imputation against RRF is that it is extremist. The plaintiff argues that that phrase in and of itself is defamatory, quoting the following definition of "extremism" from the 1935 Second Edition of Webster's New International Dictionary:

". . . quality or state of being extreme; radicalism— extremist, n.—"

Webster's New International Dictionary (3rd ed., 1961) defines "extremist" as an adjective:

". . . of, relating to, or favoring extremism, or extremists." and as a noun:

". . . an adherent or advocate of extremism; esp. RADICAL."

The Random House Dictionary of the English Language (1966) gives this definition of "extremist":

"1. a person who goes to extremes, esp. in political matters. 2. a supporter of extreme doctrines or practices. —adj. 3. belonging or pertaining to extremists."

It may indeed be argued from the declared purpose of RRF as alleged in the complaint (to restore the alphabet to its proper place) that in the view of the members of RRF the alphabet has been dethroned, and that its restoration would radically affect current methods in reading instruction.

Unless by innuendo it could be stated that the words "extremist organization" meant and were understood to mean an organization advocating obnoxious ends or the use of illegal violence and all other possible means to attain its ends, the language only means that in the opinion of the defendants RRF was an organization poles apart from the defendants in some undefined field of opinion, or, from the context of the whole advertisement, in the field of educational theory.

In the field of opinion, and particularly in the field of political opinion, it is true that what for one man is a weed, for another may be a flower.

The nature of the public reaction to political labels as affected by variations in time, place and circumstance is a matter of more than historical interest in its relation to the law of defamation.[2]

We hold that in the mental climate of 1964 it was not defamatory *per se* to say of anyone in California that he was an "extremist."

[2] In California in 1910, it was held that no harm was done to a plaintiff by bringing out during a trial that he was a Socialist (*Skrocki* v. *Stahl*, 14 Cal.App. 1, 6-7 [110 P. 957]); while in Illinois in 1919, it was held libelous *per se* to charge, among other things, that a plaintiff was a Socialist and a rebel against the prevailing economic system. (*Ogren* v. *Rockford Star Printing Co.*, 288 Ill. 405 [123 N.E. 587].)

## FALSE CHARGE OF MEMBERSHIP IN THE JOHN BIRCH SOCIETY AS LIBEL PER SE

Material libelous *per se* is a false and unprivileged publication by writing which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation. (*Jeffers* v. *Screen Extras Guild, Inc.*, 107 Cal. App.2d 253, 255 [237 P.2d 51].)

It is the function of the court to construe the alleged libelous matter in a sense that is natural and obvious, and in which the persons to whom it is communicated would be likely to understand it. (*Dethlefsen* v. *Stull*, 86 Cal.App.2d 499, 502 [195 P.2d 56].)

We are asked to notice judicially what was said or written during political campaigns in 1964 in arriving at a synthesis as to the connotations inherent in the use of the words "John Birch Society."

The following definition is given in a work of standard reference: "an ultraconservative organization, founded in December, 1958, by Robert Welch, Jr., chiefly to combat alleged communist activities in the U.S. [named after John Birch (d. 1945), American USAF captain]" (The Random House Dictionary of the English Language.)[3]

---

[3] "Along with a revival of conservative ideas during the late 1950s and early 1960s there was an emergence or reactivation of various groups of the 'radical right,' sharing some opinions with conservatives but looked upon with suspicion or distaste by many conservatives because of the virulence of their language or the impracticality of their views. The influence of such organizations was probably exaggerated both by their own members and by their liberal or radical opponents. In actuality, these groups appeared to be less powerful than they had been before World War II.

"The most widely discussed of such associations was the John Birch Society, founded by Robert H. W. Welch, Jr., a Boston businessman, in 1958 and named for a U. S. intelligence officer killed by Chinese Communists soon after the end of World War II. Unlike most other 'radical right' groups, the John Birch Society tended to attract a good many people of substance and education, including doctors, dentists and lawyers. Though its chapters existed in nearly every state, the society nevertheless remained comparatively small in membership, and enjoyed practical political success almost nowhere but in southern California. The movement's basic manual was *The Blue Book of the John Birch Society;* it was supplemented by a monthly bulletin called *American Opinion.* These publications asserted that Communism is a gigantic conspiracy to enslave mankind and that its main threat to the United States is not from Soviet military power but from internal subversion. Welch and some of his associates went so far as to declare that Dwight D. Eisenhower, Charles de Gaulle, and other eminent western statesmen were agents of Communist subversion. These extreme views were repeatedly ridiculed by leading American conservatives, as well as by liberals." (6 Encyclopaedia Brittanica [1968 ed.] p. 374.)

Even in such a definition, we discover a touch of coloration, which assumes the sincerity of the purpose but does not assume the existence of communist activities.

To fix the label "communist" falsely, directly or indirectly, has been held libelous *per se* in California. (*MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536 [343 P.2d 36].) (Cf. *Gallagher* v. *Chavalas,* 48 Cal.App.2d 52 [119 P.2d 408]; *Farr* v. *Bramblett,* 132 Cal.App.2d 36, 48 [281 P.2d 372]; *Loew's Inc.* v. *Cole,* 185 F.2d 641, 659.) The same rule has been applied in other jurisdictions. (*Spanel* v. *Pegler,* 160 F.2d 619 [171 A.L.R. 699]; see also cases collected in 171 A.L.R. 712, and in 33 A.LR..2d at 1212.)

■ The following language from *MacLeod, supra,* is relevant: "Whatever the rule may have been when anticommunist sentiment was less crystallized than it is today (see *Harris* v. *Curtis Publishing Co.,* 49 Cal.App.2d 340, 348 [121 P.2d 761]; *Gallagher* v. *Chavalas,* 48 Cal.App.2d 52, 59 [119 P.2d 408]), it is now settled that a charge of membership in the Communist Party or communist affiliation or sympathy is libelous on its face." (P. 546)

■ Membership in an organization founded to combat what was commonly believed at the time to be a dangerous and illegal conspiracy cannot be said to expose the member to the same contempt, ridicule, hatred or obloquy that are directed toward a member of the conspiracy.

The truth of that observation was recognized in *Sullivan* v. *Meyer,* 91 F.2d 301, 302 [67 App.D.C. 228], where the court said: "In the present case the plaintiff had patriotically sought to have eliminated from the public schools textbooks containing what he regarded as anti-patriotic or pro-communistic matter—a highly commendable effort on his part."

■ Where others might differ from the Birch Society is as to the number of communists, their influence, the extent of their activities, whether they constitute a threat to national security, and, if so, the immediacy of that threat.

To say that the John Birch Society is mistaken on all those questions is not to hold up its membership at all stages of its organization to public aversion, contempt or obloquy.

Plaintiffs instance a false charge of membership in the Ku Klux Klan as being libelous *per se*. Members of the Ku Klux Klan, as reported in the news media, have been charged with and convicted of murderous conspiracy, and as having been engaged in campaigns of terrorism, all connected with their membership in that organization. Nothing that has come to our attention, or of which we are permitted to take judicial

notice, has linked membership in the John Birch Society with any such activities.

It is immediately apparent that not only the ends to be served but also the means employed may make a difference between one extremist and another. There is a distinction between those whose intentions are bad, and those whose intentions are good, if possibly based upon error; between those that are wrong in their interpretation of evidence, and those that fabricate false evidence.

Nor can we say that the publicly expressed views of the founder of the Birch Society will, as a matter of law, be considered to be the opinions of all its members.

There has been a widely circulated description of the John Birch Society as composed of "little old ladies in tennis shoes," which is not calculated to arouse respect for the political judgment or influence of those members. Were we to say that the language used in the case at bench meant and was intended to mean that the founders of RRF came within that description, we must hold that little old ladies are not, as such, objects of hatred, contempt, ridicule or obloquy; and that if not otherwise hateful, contemptible or ridiculous, they do not become so when they put on their tennis shoes.

We do not doubt that there are breasts in which the words John Birch Society give rise to strong feelings of distaste. There may, also, be persons or geographical areas to which membership in the Knights of Columbus connotes a sworn commitment to a criminal conspiracy against the Protestant community; or to which adherence to the Jewish faith signifies fealty to the spurious Protocols of the Elders of Zion.

We are, however, to view the language used with the eyes by which a reasonable man would read it. ██ In the law of libel, the meaning of a communication is one that the recipient correctly, or mistakenly but reasonably, understands that it was intended to express. (3 Rest., Torts, § 563, p. 147.)

The reader who reasonably understands something must of necessity be a reasonable man. To react in so violent a fashion against one who might be a member of the Birch Society is itself an evidence of extremism; and to say that a reasonable man would so react would be to equate the reasonable man with the extremist.

██ We hold, therefore, that in 1964, in California, false ascription of membership in the John Birch Society was not *per se* defamatory.

Plaintiffs neither requested leave to amend nor now complain of the refusal to grant such leave.

Judgment affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.