Harry G. JOHN, Plaintiff,

v.

JOURNAL COMMUNICATIONS, INC., Defendant.

No. 91–C–780.

United States District Court, E.D. Wisconsin.

May 6, 1992.

Robert E. Sutton, Sutton & Kelly, Milwaukee, Wis., for plaintiff.

Brady C. Williamson and Robert J. Dreps, Lafollette & Sinykin, Madison, Wis., for defendant.

## DECISION AND ORDER

WARREN, Senior District Judge.

On March 15, 1991, Harry John commenced this defamation action in a California state court. In this action, Mr. John seeks $200,000,000 in damages for the harm to his reputation that allegedly resulted from the publication of a news article in the *Wisconsin Magazine* section of the June 10, 1990 edition of *The Milwaukee Journal.* The article reviewed the history of De Rance, Inc., a charitable foundation. This history includes a five-month Milwaukee County Circuit Court trial in 1986 that led to Harry John's removal, for gross misconduct, as a director and trustee of the foundation.

On April 12, 1991, defendant removed this action to the U.S. District Court for the Central District of California and moved to dismiss it for lack of personal jurisdiction. The California District Court denied defendant's motion to dismiss but granted defendant's alternative motion to transfer the action to this Court pursuant to 28 U.S.C. § 1404.

Now before the Court is defendant's Motion for Judgment on the Pleadings.[1]

## I. DISCUSSION

Defendant asserts that it is entitled to a judgment on the pleadings in this matter for two reasons. First, defendant argues that the truth of most of the statements in the news article regarding Mr. John has been conclusively established in *John v. John,* 153 Wis.2d 343, 450 N.W.2d 795 (Ct. App.1989), *pet. for rev. denied,* 153 Wis.2d xlix, 454 N.W.2d 805 (1990), *cert. denied,* — U.S. —, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990). Defendant asserts that Mr. John is therefore collaterally estopped from relitigating those issues in this case. Second, defendant argues that the remaining statements in the article are not defamatory as a matter of law.

1. This Court holds in abeyance defendant's alternative motion for dismissal.

2. In support of this assertion, plaintiff cites three cases: *Wyman v. Newhouse,* 93 F.2d 313

### A. Collateral Estoppel

Pursuant to 28 U.S.C. § 1738, "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). Defendant argues that this Court should adhere to findings of *John* and hold that the majority of the statements in the article in question are true as a matter of law. Since truth is an absolute defense to libel, defendant argues that this Court should dismiss Mr. John's claims with respect to these statements.

In spite of the clear requirement of § 1738 that this Court give full effect to the state court's findings in *John v. John,* plaintiff argues that this Court should not employ collateral estoppel to bar plaintiff's claims for the following reasons: (1) collateral estoppel is inappropriate with regard to motions for judgment on the pleadings; (2) a lack of mutuality between the parties bars defendant's collateral estoppel argument; (3) collateral estoppel only applies to the ultimate conclusions of the *John* case and (4) defendant's article goes beyond the findings of the *John* court. As will be shown below, these arguments generally lack merit.

Plaintiff first asserts that defendant's collateral estoppel arguments are inappropriate for a motion for judgment on the pleadings. Plaintiff states that because the truth of a statement is generally not a matter for resolution in a motion for judgment on the pleadings, this Court must presume that defendant's statements are false for the purposes of defendant's motion.[2] This Court concurs with plaintiff that defamation actions generally cannot be resolved based on the defense of truth, except on a motion for summary judgment

(2d Cir.1937), *cert. denied* 303 U.S. 664, 58 S.Ct. 831, 82 L.Ed. 1122 (1938); *Fleming v. Gamble,* 37 F.2d 72 (10th Cir.1930); *Compagnia Italiana Transporto Olii Minerali v. Sun Oil Co.,* 29 F.2d 744 (S.D.N.Y.1928).

or at trial. Nonetheless, courts have allowed parties to raise arguments of collateral estoppel in motions for judgment on the pleadings. *See, e.g. Lundy v. Coughlin,* No. 85 Civ. 5945, 1986 WL 7266 (S.D.N.Y.1986); *Temple v. City of New York,* No. 83 Civ. 7116, 1984 WL 719 (S.D.N.Y.1984). This Court agrees with the *Lundy* and *Temple* courts' use of the collateral estoppel doctrine. A party who is collaterally estopped on a factual issue can bring forward no set of facts which will allow him or her to succeed on that issue. Accordingly, if Mr. John is collaterally estopped, there is no reason for this Court to wait for summary judgment or trial to grant defendant judgment.

■ Second, plaintiff argues that this Court cannot properly employ collateral estoppel because defendant was not a party in the prior litigation. However, the law has long permitted the defensive use of collateral estoppel by litigants who were not parties to the prior proceeding.

> Issue preclusion may be "asserted defensively to prevent a party from relitigating an issue which has been conclusively resolved against that party in a prior case" to which the party asserting preclusion was not a party.

*Heggy v. Grutzner,* 156 Wis.2d 186, 193, 456 N.W.2d 845 (Ct.App.1990) (quoting *Crowall v. Heritage Mut. Ins. Co.,* 118 Wis.2d 120, 125, 346 N.W.2d 327 (Ct.App. 1984); *Accord, Bernhard v. Bank of America Nat. Trust & Savings Ass'n,* 19 Cal.2d 807, 122 P.2d 8926r (1942)). Thus, this Court may properly employ the collateral estoppel doctrine even though defendant was not a party to the *John* action.

■ Third, plaintiff appears to argue that the collateral estoppel doctrine only applies to the ultimate conclusion of *John;* *i.e.,* that plaintiff engaged in gross misconduct and breached his fiduciary duties as director of the De Rance Foundation. In *Heggy,* the Wisconsin Court of Appeals expressly rejected this contention:

> Heggy argues that issue preclusion applies only to findings of "ultimate issues

of fact." That is not the test. "An issue on which relitigation is foreclosed may be one of evidentiary fact, of 'ultimate fact' (i.e., the application of law to fact), or of law." Restatement (Second) of Judgments sec. 27 comment c, at 253 (1980). The issue of fact need only have been "essential to the judgment."

*Heggy,* 156 Wis.2d at 195, 456 N.W.2d 845 (footnote and citation omitted).

Finally, plaintiff argues that defendant's article went beyond the findings of the Court in *John.* The Court will address this argument when it examines the individual statements which Mr. John alleges are defamatory.

**B. The *Frinzi* Test**

Defendant argues that those statements not conclusively established as true by the *John* court nonetheless do not defame Mr. John as a matter of law. In *Frinzi v. Hanson,* the Wisconsin Supreme Court set forth a test for determining whether a judgment on the pleadings is appropriate in a defamation action. 30 Wis.2d 271, 275, 140 N.W.2d 259 (1966). The *Frinzi* Court stated:

> To sustain the demurrer, it must be determined as a matter of law that the language complained of is incapable under the circumstances pleaded of harming the reputation of Mr. Frinzi so "as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement, 3 Torts, Defamation, p. 140, sec. 559.
>
> In determining whether language is defamatory, the words must be reasonably interpreted and must be construed in the plain and popular sense in which they would naturally be understood in the context in which they were used and under the circumstances they were uttered.

*Id.; see also Washburn v. Wright,* 261 Cal.App.2d 789, 68 Cal.Rptr. 224, 229 (1968).[3]

---

**3.** The *Washburn* Court stated that in deciding whether a challenged statement is capable of a

defamatory meaning, a court should "construe the alleged libelous matter in a sense that is

C. Application of Collateral Estoppel and *Frinzi* Test

■ This Court will now apply the principle of collateral estoppel and the *Frinzi* test to determine whether judgment on the pleadings is appropriate in this case.

(1.) "Harry John's ideas cost a fortune. Now Erica John is rebuilding a SHAKEN FOUNDATION."—cover of

June 10, 1990 *Milwaukee* Magazine

Mr. John does not deny the literal truth of this headline. *See* Retraction Demand at 1–4, ¶¶ 1 and 2. Rather, Mr. John contends that it conveys five false and defamatory implications:

(a) Mr. John contends that the headline falsely implies that "the ideas ... were solely his...." Retraction Demand at 1–2, ¶ 1. However, the trial court's findings of fact and bench decision conclusively established the truth of this implication.

> 19) "Defendant was the dominant authority in controlling the course of events at De Rance, Santa Fe, and HBI-AC by virtue of (a) his original contributions of Milwaukee Brewery Co stock to De Rance; (b) his holdings in the key executive and financial positions in all three entities; (c) his domineering personality; and (d) his secretive and manipulative manner of operating these entities in such a way as to exclude all but himself from making the critical decisions, and the acquiescing personalities of both plaintiffs.

Findings of Fact, Conclusions of Law and Order, December 21, 1987 ("Findings of Fact").

> There is no question that [Mr. John] was, in fact, the foundation—legally and, more important, factually.... [His] domineering attitude, unfortunately, became his downfall.

Court's Decision, August 21, 1986 ("Bench Decision"), Appendix Exhibit D at 16–17.

(b) Mr. John contends that the headline falsely "implies that these 'ideas' were hare-brained [sic]." Retraction Demand at

2, ¶ 1. Reasonably construed, however, the headline does not imply that the establishment of a Catholic television network was a harebrained idea, only that John's approach to this and other ventures caused large and unnecessary expenditures, a fact conclusively established by the trial court's findings of fact. For example Judge Barron found:

> 126) Foundation paid $261,071 penalty to IRS as a result of treasure hunt investment.
> 128) Because of the investment strategy implemented by Harry John and his continued selling of securities to finance the Santa Fe television enterprise,
> (b) De Rance sustained losses of $24 million in Fund E in 1983–84 and lost an additional $17 million between October 1984 and March 1986.
> (c) Some of Milt's investments could not be liquidated due to legal restrictions.
> (d) Milt had to borrow $100,000 from another charity in the summer of 1984 in order to meet De Rance's payroll.
> (f) By October 1984, De Rance was advised that the investment managers could not liquidate sufficient securities to "meet the cash needs of De Rance."

Findings of Fact, Appendix Exhibit E.

Likewise, Judge Barron stated in his bench decision:

> "I don't fault Mr. John for a number of his decisions relating to the Catholic TV apostolate.... However, the waste in construction, the timing of the transponder lease, the vast number of employees, ... the number of expensive production units ... the ignoring of the board's decision to cap spending ... were obvious mismanagement on defendant's part."

Bench Decision, Appendix Exhibit D.

(c) Mr. John contends that the headline falsely implies that De Rance needed rebuilding because of financial difficulties at the time of his removal as a director. Retraction Demand at 2, ¶ 2. However, the Findings of Fact conclusively established

natural and obvious, and in which the persons to whom it is communicated would be likely to

understand it." *Id.*

the truth of this implication. *See, e.g.,* Finding of Fact ¶ 128 *supra* at 7.

(d) Mr. John contends that the headline falsely implies that he acted without authorization from the De Rance board. Retraction Demand at 3, ¶ 2. Reasonably construed, the headline does not carry that implication. Nonetheless, Judge Barron's Bench Decision conclusively established that Mr. John acted without authorization.

[I]t's crystal clear Harry John was the dominant authority urging on those projects [treasure hunt and TV network] plus on many occasions presenting invoices for expenditures he had already authorized personally without the okay of the board.

Bench Decision, at 22–23. His findings of fact likewise provide:

29) "The result [of Mr. John's parallel personal investments] was that defendant completely compromised De Rance's interests in a manner which was kept secret from the plaintiffs by, among others, defendant.

34) Erica John and Gallagher were "unaware" of 23 illegal cross-trade stock transactions made between Harry John and De Rance.

136–138 Mr. John lied to plaintiffs about obtaining a legal opinion authorizing De Rance investment in deep sea salvage.

159–160) Mr. John failed to obtain advance authorization for "major financial commitments from the board of directors of De Rance." Mr. John "unilaterally committed" De Rance to provide funds for the Santa Fe television venture.

170) Mr. John adopted, "over the objection of the plaintiffs, a modus operandi of, in many instances, unilaterally making financial commitments for Santa Fe and HBIAC, legally binding upon those entities, without first obtaining approval of the board of directors. Defendant would then secure 'approval' of De Rance's board of directors after the fact by presenting plaintiffs with the invoices and demanding payment under threat of litigation."

171) Mr. John told De Rance employees and consultants "not to discuss De Rance of Santa Fe business with plaintiffs. "Defendant's secrecy in running De Rance and Santa Fe effectively excluded plaintiffs from many key areas of decision-making."

189) (b) Plaintiffs had no knowledge of Mr. John's self-dealing or fraud because he withheld critical information from them.

(c) Plaintiffs' "authorization" of acts of mismanagement was coerced by Mr. John when he repeatedly presented plaintiffs with "unilateral fait accompli actions."

(d) In other instances, plaintiffs' "authorization" was secured by Mr. John materially misrepresenting and lying to plaintiffs.

(e) In other instances "authorization" was obtained by Mr. John withholding information from plaintiffs.

(e) Finally, Mr. John contends that the headline falsely implies that Erica John was responsible for any rebuilding of the De Rance after his removal. Retraction Demand at 3, ¶ 2. This implication cannot defame Harry John. Since Mr. John has not been involved with De Rance since his removal, statements about De Rance's subsequent operation should not affect his reputation. Moreover, the bench decision and findings of fact support this implication.

The foundation now seems to have stabilized through the management techniques instilled by Mr. Bolduc. While certainly not a heavy weight in the management field, especially in managing so large a sum, the plaintiffs [Erica John and Donald Gallagher] at least have the good sense to retain experts, listen to their advice, and act upon it.

Bench Decision at 27.

36) "Plaintiffs have instituted strong remedial action to cure these acts of self-dealing by defendant...."

Findings of Fact, Appendix Exhibit E.

(2.) "The trial dragged on for five months, with witness after witness detailing Harry John's wild spending, di-

cey investments and increasingly eccentric behavior."

Mr. John states that the above statement is incomplete because "at least an equal portion of the trial" was devoted to witnesses who testified that Harry John had "prudently and appropriately" directed the Foundation's investments. Retraction Demand at 4, ¶ 4. It is true that slightly over half of the witnesses testified on John's behalf (30 for the defendant and 29 against, *see* Findings of Fact at ¶ 185). However, this fact does not demonstrate any falsity in defendant's statement. As defendant notes, the record contains numerous examples of John's wild spending (*e.g.*, "$86 million dollars on unnecessary and wasteful broadcasting facilities and productions centers"—Findings of Fact at ¶ 152), dicey investments (*e.g.*, "silver mines, Mexican mutual funds, gold futures, and illegal securities, let alone deep sea treasure hunts" are totally imprudent for a foundation's portfolio. Bench Decision at p. 26), and eccentric behavior (*e.g.*, "consulting a star-gazing parapsychologist"— Bench Decision at 27).

> (3.) "Gallagher and Erica John now run the foundation and have brought it back from its financial deathbed to a state of health."

John objects both to the statement of the foundation's financial condition and the assertion that Erica John and Donald Gallagher "resuscitated the Foundation." Retraction Demand at 5, ¶ 5. As defendant notes, both facts have been conclusively established as true. The "financial deathbed" reference accurately describes the foundation's financial health when Harry John was removed as a director. *See* Findings of Fact at ¶ 175(a) (Mr. John "engage[d] in a course of spending that would have caused De Rance to [expend] $79 million for the period of November 1, 1984 to October 31, 1985, when De Rance did not have sufficient funds to meet such commitments"). Both the trial court's decision and its findings of fact establish that the current directors are responsible for De Rance's recovery. *See supra* at 203.

> (4.) "No one minded Harry's eccentricities: for example, ... or his habit of adding nuts or raisins to his noontime soup—and urging his grant-seeking guests to do the same."

Mr. John asserts that the above statement is false. He states:

> The truth is that Harry John never had such a habit nor did he urge any guests—grant seeking or otherwise—to indulge in it. Since the inauguration of the litigation against Mr. John on October 5, 1984, this kind of malicious and fictional disparagement (some of it of a much more serious nature) has routinely been used by Mrs. John and Donald Gallagher to attack Mr. John.

A Retraction Demand at 5, ¶ 6. Whether defendants's statement is true or false does not matter since it is incapable of harming plaintiff's reputation.

> (5.) "... 'it seemed that he wanted what he would call a "true Catholic orthodoxy" taught. How do you interpret that?'"

Mr. John asserts that the implication of the above statement is that he "in some fashion deviated from the dogmas or teachings of the Roman Catholic Church." This Court disagrees. Reasonably interpreted, the statement merely implies that Mr. John held conservative Catholic views. If anything, the statement implies that plaintiff supported strict adherence to Catholic dogmas and teaching.

> (6.) "... 'Harry became more Catholic than the Pope.'"

Mr. John asserts that this statement also implies that he, in some fashion, deviated from the dogmas or teachings of the Roman Catholic Church and, more particularly, that he became "a zealot whose philosophy and religious beliefs were somehow beyond or apart from those of the Pope." Retraction Demand at 6, ¶ 7. However, as defendant notes, reasonably construed, the statement merely says that Mr. John was exceptionally devout in practicing his religion. Accordingly, the statement is incapable of lowering Mr. John in the estimation of the community or deterring third persons from associating or dealing with him.

(7.) "Harry's increasing rigidity as a grant maker seemed to start with the arrival of a group of ultraconservative Catholic advisors, people she would rather not name. They convinced Harry that his wealth gave him power and persuaded him to wield it."

Mr. John does not deny his "increasing rigidity as a grant maker." Retraction Demand at 6. Mr. John asserts, however, that "there were not ultraconservative Catholic advisers who arrived or influenced [him] at any time." Defendant has pointed to no portion of the *John* findings or decision which supports the assertion that Mr. John was influenced by a group of ultraconservative Catholic advisors. However, even if the assertion is false, it merely tends to show that Mr. John associated with ultraconservative Catholics and perhaps was one himself. The Court finds that the statement cannot harm his reputation as to lower him in the estimation of the community or to deter the third persons from associating or dealing with him.

(8.) "If Erica John or Gallagher questioned his decisions, he blasted them as infidels, heathens, enemies of the church—"

Mr. John does not challenge the literal truth of this statement. *See* Retraction Demand at 6–7, ¶ 9. Moreover, any such challenge would be improper. The testimony, as characterized by Judge Barron his bench decision, provides:

How dare those experts and the plaintiffs challenge him? For all those years [Erica John and Gallagher] went along with [Mr. John], why not now?—just when his good was in sight. It's easier to call them infidels or workers of the Devil or only acting in their own self-interest than to accede to their reasoned advice.

Bench Decision at 16–17.

(9.) "By their own admission, Erica and Gallagher became a rubber-stamp board often operated blindly, kept in the dark by Harry's refusal to share with them even basic information about the foundation's finances."

The trial court's decision and findings of fact conclusively establish the truth of this statement and directly contradict Mr. John's assertion that "Erica John and Donald Gallagher were apprised of all decisions of the Foundation and ... approved the expenditures and investment." Retraction Demand at 6–7, ¶ 9. *See* supra at 202–203.

(10.) "Without informing Erica or Gallagher, Harry began spending millions of dollars buying equipment and TV stations."

Mr. John contends that "all expenditures made in connection with the television enterprise were approved by Erica and Gallagher."[4] Retraction Demand at 9, ¶ 13. However, as defendant notes, the trial court's decision and findings of fact directly contradict this assertion. *See supra* at 202–203.

(11.) "Santa Fe bled De Rance of an astounding $32.2 million. The number could have been even higher."

Mr. John does not challenge the literal truth of this statement, which was conclusively established at trial. *See* Findings of Fact at ¶ 152 (De Rance eventually spent in excess of $86 million dollars on unnecessary and wasteful broadcasting facilities and production centers). Rather, Mr. John again claims that "whatever was the amount" it was "authorized and approved" by the De Rance Board. Retraction Demand at 9, ¶ 14. This assertion directly contradicts the trial court's decision and findings of fact. *See supra* at 202–203.

(12.) "The judge agreed and issued a temporary restraining order that would remain in effect until a trial could be held. Harry was put out, but even though he could no longer spend foundation money, [by the time the directors got through paying and renegotiating the outstanding bills, Santa

**4.** Mr. John also claims that this statement is somehow false and defamatory because some of the television and radio stations "were ultimately sold at a profit." However, as defendant notes, this assertion does not contradict the statement's literal truth. Retraction Demand at 9, ¶ 13.

Fe would consume an additional $14.3 million."] [5]

Mr. John does not deny that a temporary restraining order was entered and continued through the trial. However, he again asserts that the implication that *he* was responsible for the spending is false. Retraction Demand at 9–10, ¶ 15. As stated above the Judge Barron's findings and decision clearly hold that Mr. John was responsible and preclude him from relitigating his claim that the De Rance board "approved and authorized" all expenditures. *See supra* at 202–203.

> (13.) "Any of Harry John's actions, taken alone would have damaged the De Rance Foundation. Taken together, they nearly destroyed it."

This statement is not actionable because it was not specified in Mr. John's retraction demand. Moreover, its truth has been conclusively established in the Judge Barron's decision and findings of fact. His decision found both that Mr. John engaged in misconduct and that his actions nearly destroyed the foundation.[6]

> [Mr. John's] intentional waste and mismanagement in itself may not amount to gross misconduct, but when combined with the self-dealing, front running, investing in other wild schemes totally inappropriate for a foundation, and market manipulation [, it] clearly reflects the grossness of Harry John's misconduct."

Bench Decision at 19.

> "[T]he world's largest Catholic foundation ... was on the brink of collapse" when John was removed.

Bench Decision at 7.

> (14.) "His incredible spending, on both Santa Fe and the search for the Cen-

tral American, peaked at about $2 million a week."

Mr. John does not challenge the literal truth of this statement but again asserts that it falsely implies that the expenditures were his alone rather than those of the De Rance board. Retraction Demand at 10, ¶ 16. As defendant notes, Judge Barron specifically stated that Mr. John "ignored all warnings to curtail spending that went as high as $2 million a week," Bench Decision at 19, and found that the Board had not authorized those expenditures. *See supra* at 203.

> (15.) "Perhaps that was the reason that Harry and his money managers at First Wilshire got involved in a variety of illegal trade practices."

Mr. John asserts that he never "engaged in any illegal trade practices with his money managers at First Wilshire." Retraction Demand at 10, ¶ 17. However, the trial court's decision and findings of fact conclusively established the truth of this statement. For example, Judge Barron found that Mr. John held parallel investments with De Rance and then abused his positions as chief financial officer, director and trustee of De Rance to profit personally from market moves by the foundation. *Id.* *See* Findings of Fact ¶¶ 20–33. Mr. John did this despite being a "disqualified person" under the Internal Revenue Code and an "insider" under the "applicable federal securities laws." John accomplished this illegal market manipulation with the assistance of his investment advisors at First Wilshire who also represented De Rance. *Id.*

> (16.) "First, Harry would have First Wilshire buy stock in a small company and add it to his personal portfolio. Then the managers, using De Rance money,

**5.** The bracketed portion of this passage was not mentioned in Mr. John's retraction demand. *See* Retraction Demand at 9–10, ¶ 15.

**6.** The findings of fact detailed many examples of John's damaging conduct which he is precluded from relitigating here:
20–37) Self-dealing: market manipulation and cross-trading.
38–44) Funneling De Rance money to undisclosed deep sea salvage ventures.

45–51) Securities fraud.
52–57) Tax fraud.
80–123) Undisclosed conflicts of interest.
125–135) Jeopardizing investments and breaches of fiduciary duty to the foundation.
136–142) Deception of the De Rance Board.
143–147) Disobedience of board mandates to control spending.
148–175) Numerous instances of mismanagement.
Findings of Fact, Appendix Exhibit E.

would buy a large quantity of the company's stock—enough to force up the price of the stock that Harry had just bought for himself and to give first Wilshire the right to demand a seat on the company's board of directors.

When Harry decided to sell his stock and claim his profit, he would sell it to De Rance, the only buyer First Wilshire could find.

Both of these tactics—known as front-running and cross-trading—are illegal.

In some instances, Harry and his money managers would muscle their nominee onto the board of directors of a small company where they intentionally would raise havoc within the company and would keep pressure on until the other directors agreed to buy back the stock—at a premium rate. It's a tactic known as 'greenmail.'

First Wilshire claimed to have used the tactic on more than 60 small companies."

■ Defendant asserts that the *John* trial court's decision and findings of fact conclusively established the truth of the above statements. This Court concurs that the majority of the statements have been conclusively found to be true by the trial court.[7] However, this Court has been unable to locate, in the citations of defendant, findings by the *John* court that Mr. John's scheme gave First Wilshire the right to demand a seat on a company's board of directors or that the assertions contained in the last paragraph are true. However, because defendant may be able to cite other portions of the *John* case which demonstrate the truth of these assertions, this Court will hold in abeyance defendant's

motion with respect to statement Number 16.

(17.) "Despite all the testimony about illegal activity, Harry John has never been charged with a crime, something that Cannon, the Milwaukee attorney, attributes to the short statute of limitations on securities violations."

Defendant can point to no language in the *John* decisions which supports the assertion that Mr. John has never been charged with the crime because of the short statute of limitations on securities violations. However, at its worst, the above statement implies that Mr. John committed the illegal activity referred to in the *John* case. Since the *John* Court conclusively found that Mr. John did commit the illegal activities referred to at trial, this Court must accept as true the assertion that he did commit those crimes. Accordingly, this Court finds, as a matter of law, that the above statement is not defamatory.

(18.) "In fact, they feared the tax liabilities that the sea search might cause the foundation. Despite the supposed advice of the tax specialist who later died, sea-salvage operations are not within the realm of allowable investments for a non-profit organization, at least not at the magnitude of Harry's investment."

Mr. John asserts that this passage is both false and defamatory because the sea salvage investments were made by the De Rance Board and not him personally. Retraction Demand at 12. However, as noted above, the *John* court found differently. *See supra* at 202–203.[8]

---

**7.** The first paragraph with the exception of the assertion that Mr. John's scheme gave First Wilshire a right to demand a seat on the company's board of directors was conclusively found to be true. *See* Findings of Fact at ¶¶ 27, 29. Judge Barron also found the statements contained in the second and third paragraphs to be true. *See id.* at ¶¶ 34–35, 46.

**8.** Moreover, Judge Barron specifically found that Mr. John acted unilaterally with respect to the sea search.

38) "Defendant was responsible for conceiving, promoting, and implementing De Rance's decision in 1983 to invest approximately $3,457,-191 in four deep sea treasure hunt efforts...."

125) "Moreover, the particular expenditures [sea salvage] were unilaterally decided upon by the defendant without adequate investigation of the facts and risks involved."

169) John "deliberately committed $3,457,191 to Santa Fe to finance two deep sea treasure hunt schemes without sharing relevant information with the plaintiffs so as to enable them to make prudent decision."

Findings of Fact, Appendix Exhibit E.

(19.) "De Rance would end up paying more than $250,000 in federal tax penalties because of the treasure hunt."

Mr. John contends that the Foundation's sea salvage investments "are within the realm of allowable investments for a nonprofit organization and there is nothing in the governing rules and regulations that forbids or proscribes such operations." Retraction Demand at 13, ¶ 25. However, as defendant notes, the trial court's decision and findings of fact conclusively establish the contrary.

Defendant says that the plaintiffs voluntarily paid a jeopardizing tax for the ill-conceived sea salvage ventures. The evidence discloses it was due on a self-assessment basis and could have easily resulted in a higher penalty if not so declared.

Bench Decision, at 20.

125) The sea salvage ventures were "inherently unsuitable for charity" and the expenditures by De Rance were in "violation of Section 181.77(1)(c) of the Wisconsin Statutes and Section 4944 of the Internal Revenue Code of 1954 as amended."

126) "The Court further finds that plaintiffs properly paid this tax on the basis of the self-assessment requirement of the Internal Revenue Code. Moreover, had plaintiffs not paid this tax, De Rance could have been forced to pay additional penalties to the Internal Revenue Service."

Findings of Fact.

(20.) "In the Offices of the De Rance Foundation, in an unmarked building at 7700 W. Blue Mound Rd. in Wauwatosa, there is a new atmosphere. People are happy again. Gone is the suspicion and bitterness that had come to permeate the office in Harry's last days."

Mr. John asserts that the above statement is false for two reasons: (1) Mr. John's "last year was spent not in the Milwaukee office, but in the Hollywood office working night and day to launch the Sante Fe National 24–hour–per–day Catholic TV Network" and (2) "after Mr. John

was enjoined from participation in the Foundation, the overseers of the Foundation engaged in the purge of personnel both in Milwaukee and in Hollywood which continued for months, if not years. And during said purge, there was an atmosphere of suspicion, bitterness, and disillusion among the personnel that were discharged." Retraction Demand at 13, ¶ 26.

Mr. John's first assertion, even if true, does not contradict the truth of the above statement. The above statement merely says that during Mr. John's last days with the Foundation, suspicion and bitterness permeated the office. Mr. John's assertion that he spent most of his time in Hollywood and not in Milwaukee during his last year with the Foundation, does not contradict that statement.

Mr. John's assertion that discord among personnel continued even after he was enjoined from participating in the Foundation's affairs may tend to contradict the first two sentences of the above statement. However, those sentences do not apply to Mr. John. As such, they cannot affect his reputation in the community or deter third persons from dealing with him.

(21.) "Byrne guesses that the low point for the foundation came shortly after the trial, when the total value of the foundation fell below $30 million. Cannon paints an even bleaker picture. He points to one $10 million loan made to De Rance and says that, had the creditor called it in, it would have been the end of the foundation."

Mr. John asserts that the "true facts are that at no time did the total value of the Foundation fall below thirty million dollars and the attribution as credible to the statements of Byrne and Cannon are totally without factual basis." Retraction Demand at 13 ¶ 27. In response to plaintiff's assertion, defendant does not cite any portion of the *John* decisions which specifically holds that the value of the Foundation fell below thirty million dollars or that the calling in of a ten million dollar loan could have ruined the Foundation. However, defendant notes that substantial truth is a complete defense to an action of defama-

tion. *See DiMiceli v. Klieger*, 58 Wis.2d 359, 363, 206 N.W.2d 184 (1973). In *Prahl v. Brosamle*, the Wisconsin Court of Appeals outlined Wisconsin's substantial truth doctrine.

It is not necessary that the statement in question be true in every particular. "All that is required is that the statement be substantially true." *Lathan v. Journal Co.*, 30 Wis.2d 146, 158, 140 N.W.2d 417, 423 (1966). *Lathan* quotes from what is now comment f to sec. 581A, *Restatement (Second) of Torts* at 237 (1965): "It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."

98 Wis.2d 130, 141, 295 N.W.2d 768 (Ct. App.1980).[9]

The above statement has been found to be substantially true. The statement can be defamatory only inasmuch as it shows that Mr. John wasted the value of the assets of the Foundation, causing the foundation to reach the brink of financial disaster. The *John* Court has conclusively found that Mr. John's behavior inflicted these costs on the Foundation. *See supra* at 206.

(22.) "Obviously, as the total worth of the foundation plummeted, so did the amount that it was able to provide in grants."

As defendant notes, the truth of this statement has been conclusively established. *See supra* at 206.

(23.) "Today, Gallagher estimates, the foundation is back to where it was in the 1970s. At the end of 1989, it was worth $95.2 million...."

Mr. John asserts that the "true facts are that the worth of the Foundation never was substantially below 95.2 million and that nothing has been done except to churn the assets and to liquidate them so as to make it appear that there was some substantial reduction in the value of the foundation." Retraction Demand at 14, ¶ 28. Mr. John's assertion does not contradict the literal truth of the above statement. To the extent that he asserts that this statement improperly implies that he caused substantial waste to the assets of the foundation and caused it to incur severe financial difficulties, the findings of the *John* court conclusively support the truth of the statement. *See supra* at 204, 205–206.

(24.) "But instead of producing 24 hours of programming a day and beaming it nation-wide, Santa Fe produces about a half-hour a day, a program called 'Heart of the Nation' which is syndicated across the country and on the Armed Forces Network overseas."

Mr. John asserts that the "true facts are that the program 'Heart of the Nation' was initiated and produced during the period that Mr. Harry John was active as an officer and director of De Rance and Santa Fe." Retraction Demand at 14, ¶ 29. However, as defendant notes, the article does not state nor imply that anyone other than Mr. John "initiated, named, developed, [or] directed" the program prior to his removal as director and trustee of the foundation. In addition, this Court finds that the statement, reasonably construed, cannot defame Mr. John since it is not about him.

(25.) "He turned on Gallagher viciously, accusing him during the trial of stealing from the foundation and trying to claim fraudulent tax deductions. Judge Barron did what he could to limit the attacks."

---

**9.** The United States Supreme Court likewise outlined the substantial truth doctrine in California law:

The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. *See* Restatement (Second) of Torts § 563, Comment c (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 776 (5th ed. 1984). It overlooks minor inac-

curacies and concentrates upon substantial truth. As in other jurisdictions, California law permits the defense of substantial truth, and would absolve a defendant even if she cannot "justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details." B. Witkin, Summary of California Law, § 495 (9th ed. 1988) (citing cases).

Mr. John does not dispute the literal truth of this statement. Indeed, he admits "that evidence introduced at the trial concerning improprieties by Donald Gallagher and the evidence was discouraged, disparaged, and prohibited by Judge Barron." Retraction Demand at 14, ¶ 30.[10] Since Mr. John does not allege falsehood, this statement cannot give rise to a claim of defamation.

> (26.) "During the last days of the trial, the strain often showed more clearly on Erica's face than on Harry's. She was the one who had to summon the courage to challenge her domineering husband, knowing that it likely would be the end of their life together, knowing that it could topple the foundation and everything they had worked for. As Judge Barron read his decision, Erica wept.

With regard to the above quotation, Mr. John states:

> "the true facts are that Erica John and Donald Gallagher testified in pretrial depositions that they commenced the action against Harry John because they were advised to take the action against Mr. John and keep it secret by the Vatican Ambassador to the United States Archbishop Pio Laghi after he had summoned them to his ambassadorial offices in Washington, D.C. in August and September of 1984. A close family friend and physician, Dr. John Brennan, testified that Erica John has confessed to commencing the action because she felt she was obliged to do so under pain of grievous sin if she did not."

Retraction Demand at 415, ¶ 31. Mr. John's statement of the "true" motivation of Erica John and Donald Gallagher does not affect the truth of the above statement. In addition, the only reference concerning Mr. John in the statement which could demean him is that he is "domineering."

This assertion has been conclusively established by the trial court and, accordingly, the passage is not defamatory as a matter of law. *See* Bench Decision at 16. ("Harry John also has a domineering personality. This came through with all the witnesses with whom he had contact.")

## II. SUMMARY

Under the foregoing reasoning, this Court GRANTS IN PART defendant's motion for judgment on the pleadings. This Court FINDS AS A MATTER OF LAW that statements # 1–15 and 17–26 are not defamatory. This Court HOLDS IN ABEYANCE determination of defendant's motion with respect to statement # 16. This Court requests the parties to submit further briefing with respect to this statement. Defendant will have fifteen (15) days from the signing of this order to submit its briefing. Plaintiff will then have an addition ten (10) days to file a response. This Court will address the remaining motions in this case after it receives the parties' briefing with respect to statement # 16.

SO ORDERED.

---

**10.** As defendant notes, the trial court expressly found that Mr. John failed to prove misconduct by Gallagher or Erica John. *See* Findings of Fact at ¶ 201. Accordingly, the court dismissed his counterclaim against them.

"The first [issue to be addressed] is the counterclaim because to dispose of that is, in my judgment, very easy. The defendant alleges a conspiracy among the plaintiffs ... [and others] to take over De Rance Foundation.... [T]here's no evidence in my judgment whatsoever of any conspiracy involving plaintiffs" Bench Decision at 5.