**Earle A. PARTINGTON, Plaintiff,**

v.

**Vincent T. BUGLIOSI, et al., Defendants.**

**No. 92–00529 DAE.**

United States District Court,
D. Hawaii.

June 3, 1993.

Earle A. Partington, pro se.

Neville L. Johnson, Eric M. Moses, Neville L. Johnson & Associates, Los Angeles, CA, for Earle A. Partington.

Paul Alston, David A. Nakashima, Alston Hunt Floyd & Ing, Honolulu, HI, for Vincent T. Bugliosi, Bruce B. Henderson, W.W. Norton & Co., Inc., Random House.

Sidney K. Ayabe, Francis M. Nakamoto, Libkuman Ventura Ayabe Chong & Nishimoto, Honolulu, HI, for Green Epstein Productions, Inc., Columbia Pictures Television, Inc., Matthew O'Connor, Tommy L. Wallace, Jim Green, Alan Epstein, James Henerson.

Sidney K. Ayabe, Francis M. Nakamoto, Rhonda A. Nishimura, Libkuman Ventura Ayabe Chong & Nishimoto, Honolulu, HI, for CBS Inc.

*ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO AMEND COMPLAINT, DENYING PLAINTIFF'S MOTION FOR CERTIFICATION OF QUESTION OF HAWAII LAW AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

DAVID ALAN EZRA, District Judge.

The court heard defendants' motion to dismiss and plaintiff's motions to amend complaint and for certification of question of Hawaii law on May 24, 1993. Neville L. Johnson, Esq. and Earle A. Partington, pro se, appeared on behalf of plaintiff. Paul Alston, Esq. and David A. Nakashima, Esq. appeared on behalf of W.W. Norton & Company, Inc., Random House, Inc. (incorrectly identified as W.W. Ballantine Books), Vincent T. Bugliosi, and Bruce B. Henderson (collectively, "the book defendants"). Francis M. Nakamoto, Esq. appeared on behalf of CBS Inc. (incorrectly identified as CBS Television, Inc.), Green Epstein Productions, Inc., Matthew O'Connor, Jim Green, Alan Epstein, and James Henerson (collectively, "the television defendants").

After reviewing the motions, the supporting and opposing memoranda, and hearing oral argument, the court GRANTS IN PART AND DENIES IN PART plaintiff's motion

to amend complaint, DENIES plaintiff's motion for certification of question of Hawaii law, and GRANTS in all respects defendants' motions for summary judgment save and except Bugliosi's motion for summary judgment as to Count I which is DENIED.

## I. Factual Background

The allegations in this defamation case arise indirectly from a bizarre incident that took place on Palmyra Island nearly two decades ago. Palmyra Island is a possession of the United States located in the North Pacific Ocean. It is uninhabited.

Sometime during the summer of 1974, Stephanie Stearns and Buck Duane Walker sailed from Hawaii to Palmyra Island on an old sailboat, the "Iola." Once there, Stearns and Walker feared to leave the island because they had packed inadequate food and supplies for their return voyage and because the condition of their vessel, which was poor at the start of the trip, had grown worse.

Some short time after Stearns and Walker reached Palmyra Island, a second sailboat, "Sea Wind," arrived at the island from San Diego. The "Sea Wind," which was in considerably better condition and better equipped than the "Iola," carried a crew of two on board—Muff and Mac Graham.

On or about October 28, 1974, Stearns and Walker sailed the "Sea Wind" into Hawaii. Curiously, the boat had been repainted since it left San Diego. Stranger still, the Grahams were not aboard. Stearns and Walker told the authorities that they believed the Grahams had died in a boating accident. They were later charged, tried, and convicted in the state court of Hawaii for the theft of the "Sea Wind."

In 1981, by mere happenstance, the bones of Muff Graham were found washed up on Palmyra Island. Soon thereafter, Stearns and Walker were indicted for the murder of Muff Graham in the United States District Court of Hawaii. The district court appointed Earle Partington to represent Buck Walker. Stearns made separate arrangements to be represented by Vincent Bugliosi and other counsel.

Partington and Bugliosi are colorful figures indeed. Partington, a well-known criminal defense lawyer in Honolulu, practices frequently in the state and federal courts of Hawaii and California. A contributing source of his notoriety, relevant here for its potential mitigating effect on damages alleged by Partington, was his involvement in *State v. Clarke*, a case in which the Hawaii Supreme Court reversed a conviction of Partington's client as a result of Partington's passive behavior at trial.[1] State disciplinary proceedings resulting from that case, in which, among other things, Partington failed to make an opening statement or closing argument and refused to examine key witnesses, are still pending. Partington concedes that his participation in that case has caused him to suffer considerable negative publicity.

Vincent Bugliosi is well-known both as a lawyer and as an author. Bugliosi originally earned his national reputation as the prosecuting attorney in Charles Manson's trial for the murder of Sharon Tate, and from his best-selling chronicle of that proceeding and the events that led to it, *Helter Skelter*, that he subsequently penned.

Following the criminal trials of Walker, who was convicted, and Stearns, who was acquitted, Bugliosi, together with Bruce Henderson, wrote *And The Sea Will Tell* (occasionally referred to hereinafter as simply "the book"), an account of the Graham murder and Bugliosi's role in successfully defending Stearns against the murder charge.

On February 24 and 26, 1991, a television miniseries was broadcast nationally by CBS, Inc. ("CBS"). The movie was produced by Epstein Productions, Inc. in conjunction with CBS. The movie was written by Tommy Wallace and James Henerson. Defendants Matthew O'Connor, Alan Epstein, and Jim Green were the producers.

Partington commenced this action on August 14, 1992 seeking damages on nine counts for six statements that he alleges were defamatory and cast him in a false

---

1. A more detailed discussion of the factual and procedural history of the *Clarke* case is set forth in the Ninth Circuit's opinions in *Partington v. Gedan,* 961 F.2d 852 (9th Cir.1992).

light. The fact that these various statements were made is not in dispute. It is only their legal effect that is contested.

In Count I of the first amended complaint, filed November 3, 1992, Partington alleges that the book defendants defamed him by stating that he was formerly a state prosecutor in South Africa in the hardcover edition of *And The Sea Will Tell.*

In Counts II and III, Partington contends that the book defendants defamed him and cast him in a false light by implying that he, and his co-counsel Ray Findlay, had not read the transcript of the state court theft trial that had taken place several years earlier.

Count IV concerns a statement made by Bugliosi and Henderson in the book criticizing Partington and Findlay for taking, in the opinion of the authors, an overly submissive stance against the allegedly biased actions of The Honorable Samuel P. King, the judge presiding over Walker's trial. The authors analogized Partington's behavior to a steer being led to the slaughterhouse. Partington alleges that this statement cast him in a false light.

In Counts V and VI, Partington alleges that the book defendants defamed him and cast him in a false light by writing that he had failed to introduce evidence of an entry contained within a diary kept by Stearns indicating that Stearns and Walker had previously socialized with the Grahams. Though Partington does not contest the fact that he failed to introduce this evidence, he claims that the false implication of the statement was that he does not conduct his professional business competently.

Count VII concerns the authors' criticism of Partington's failure to call J.W. Williams as a witness at trial. Williams was allegedly a witness to a confession made by Walker while in prison. Partington stated that he declined to call Williams because he was uncertain of what his testimony might be in light of contradictory stories that Williams had told the grand jury and an FBI investigator. Bugliosi and Henderson stated that Partington's decision was "plausible, except for the inconvenience of fact." Partington contends that this statement implies that he is a liar and an incompetent attorney.

The final two counts concern the following statement made in the television adaptation of the book by the character portraying Vincent Bugliosi: "If I defend you [Stearns] the way Partington is defending Walker, you'll spend the rest of your life in prison." Partington again alleges that these statements were defamatory and cast him in a false light.

## II. Procedural Background

On March 10, 1993, the book defendants moved to dismiss the first amended complaint under Fed.R.Civ.P. 12(b) for lack of jurisdiction and for failure to state a claim upon which relief could be granted. The television defendants filed an identical motion on April 2, 1993.

Because the defendants submitted, and the court deemed admissible, matters outside the scope of the pleading, the court informed the parties of its intention to treat the motion to dismiss as a motion for summary judgment pursuant to Fed.R.Civ.P. 12(b) and 56. The parties were granted leave to supplement their positions with additional documentary evidence.

On April 1, 1993, Earle Partington moved to certify the following questions to the Hawaii Supreme Court:

(1) Does Hawaii recognize the tort of false light as defined in the Restatement (2d) of Torts?

(2) If so, must special damages be plead for such an action to lie?

Additionally, Partington makes several references in his opposition to the motions for summary judgment of his intention to amend his complaint. The court treats these references as a motion for leave to amend under Fed.R.Civ.P. 15(a).

Thus, this case is currently before the court on three matters: defendants' motion for summary judgment, plaintiff's motion for certification of question of Hawaii law, and plaintiff's motion for leave to amend complaint.

## III. Analysis

### A. Choice of Law

█■ A federal court sitting in diversity jurisdiction, as the court is here, must apply the substantive law of the forum state. *Davis v. Metro Prod., Inc.*, 885 F.2d 515, 524 (9th Cir.1989). Accordingly, Hawaii law applies.

### B. Defendant's Motion for Summary Judgment

#### 1. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

█ The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The movant must be able to show "the absence of a material and triable issue of fact," *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987), although it need not necessarily advance affidavits or similar materials to negate the existence of an issue on which the non-moving party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. *But cf., Id.*, at 328, 106 S.Ct. at 2555 (White, J., concurring).

█ If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support his legal theory. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir.1979). The opposing party cannot stand on his pleadings, nor can he simply assert that he will be able to discredit the movant's evidence at trial. *See*

*T.W. Elec.*, 809 F.2d at 630. Similarly, legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Moreover, "if the factual context makes the non-moving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Architectural Building Products, Inc. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)) (original emphasis).

█ The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Eisenberg*, 815 F.2d at 1289.

█ However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the non-moving party with respect to that fact." *T.W. Elec.*, 809 F.2d at 631. Also, inferences from the facts must be drawn in the light most favorable to the nonmoving party. *Id.* These inferences may be drawn both from underlying facts that are not in dispute, as well as from disputed facts which the judge is required to resolve in favor of the non-moving party. *Id.*

#### 2. Count I—"Partington was a former state prosecutor in South Africa"

Partington's first allegation is that the book defendants defamed him by stating that he had been a prosecutor in South Africa. He claims that the effect of that false state-

ment is the equivalent of having called him a prosecutor in Nazi Germany.[2]

Defendants offer three arguments against the legal sufficiency of this claim. First, they contend that the statement is not defamatory since it is not capable of reasonably sustaining the meaning ascribed to it by Partington. Second, defendants contend that the statement is not libelous per se and that Partington is consequently required to plead special damages which defendants claim he has failed to do. Finally, defendants argue that Partington is a public figure, and hence is required to plead actual malice which defendants again claim he has failed to do.

## A

The court first considers the question of whether the statement might reasonably be considered to be defamatory. Defendants contend that the statement cannot sustain the meaning ascribed to it by Partington and hence is not defamatory as a matter of law.

The court is presented here with the logical question of whether the words in issue may reasonably be said to bear the connotation alleged to them by plaintiff. The potential effect of the alleged meaning is a separate question that is considered in determining whether the statement is defamatory per

se and hence actionable without proof of special damages.

In a libel case, it is the role of the court to determine whether a challenged statement is "capable of bearing a particular meaning and whether that meaning is defamatory." *Restatement (Second) of Torts* § 614(i). *See also Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C.Cir.1987).[3] The jury's proper role is to determine whether a published statement, held by the court to be capable of sustaining a defamatory meaning, was in fact attributed such a meaning by its readers. *Restatement (Second) of Torts* § 614(2).

Under Hawaii law, a statement is defamatory if it "tends to 'harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Fernandes v. Tenbruggencate*, 65 Haw. 226, 228, 649 P.2d 1144 (1982) (quoting *Restatement (Second) of Torts* § 559 (1976). Whether a communication is defamatory "depends, among other factors, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place." *Id.* (citations omitted).

---

**2.** The complete statement is found at page 215 of the book in a passage introducing Partington to the readers:

> With black hair thinning on top and deep lines creasing his face, Partington seemed older than his forty-three years. A confirmed bachelor, teetotaler, and non-smoker, he was a former assistant public defender in San Francisco and state prosecutor in South Africa and Hawaii. His voice had a whiny edge that, combined with his feisty nature, would grate on judge and jury alike, but the wiry Partington savored his reputation as one of Hawaii's scrappiest attorneys.

Complaint at ¶ 32.

The paperback version of the book corrected this mistake. It accurately states that Partington was formerly a state prosecutor in "South Rhodesia (now Zimbabwe)" at page 239. The first printing of the paperback version of the book occurred in February 1992. This fact, however, is of no consequence to the court's analysis of the instant motion. Retraction of a defamatory publication is a partial defense to a libel claim and may show mitigation of damages, but it cannot,

by itself, defeat the underlying claim. "That a retraction was promptly published might be considered evidence of lack of malice in certain instances but would not be sufficient as a matter of law for that purpose." S. Speiser, et al., *American Law of Torts* (1992), § 29:119.

**3.** Defendants cite *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1016 (1st Cir.1988), *cert. denied* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988), for the proposition that words susceptible of sustaining more than one meaning are not defamatory. This badly misstates the holding of *Fudge* which turned on a finding that a characterization of three young girls as "amazons" was a statement of opinion rather than an assertion of fact. The general principle stated by defendants is wrong as well. As noted in the text above, the question for the court is whether a statement *may* sustain a defamatory meaning. Most statements, depending on context, are capable of sustaining more than one meaning. The question of whether the meaning was in fact defamatory in a particular case is a question for the jury.

While it is questionable whether the statement is akin to accusing Partington of working for the Third Reich, as argued by Partington in his opposing memorandum, the statement is certainly capable of the defamatory meaning alleged by Partington in his complaint—that he "worked for and/or supported the apartheid state, system, and policies of the Republic of South Africa." Complaint at ¶ 33. The focus here is upon the nature of the inference suggested by the plaintiff. That is, whether the effect of the statement alleged by plaintiff flows reasonably from the words themselves.

Here, the relationship is quite direct. The statement in question specifically implies that Partington was in some positive manner associated with the South African government. It most certainly implies that Partington worked for the South African government. In fact, it's difficult to imagine any other meaning that could naturally flow from the statement.

The second meaning alleged by Partington—that he supported the policies of the apartheid regime—flows somewhat less directly though naturally from the statement. A finder of fact could reasonably conclude that a state prosecutor, a person employed for the specific purpose of enforcing and upholding the laws of the government by whom he or she is employed, in fact supported the policies of that government.[4]

The association with South Africa may be defamatory since it might have the effect of harming Partington's reputation or lowering his esteem in the community as required under *Fernandes*. At the time of the publication of the book, the South African government was widely recognized to be racist and violative of basic human rights.[5]

Defendants contend that the falsity of this statement is of no moment since Partington was a prosecutor in South Rhodesia which they contend is akin to being a prosecutor in South Africa. Partington does not contest the truth of that statement, though he strenuously objects to its relevance.

Partington's objection is well-taken. The effect of Partington's position in the South Rhodesian government would be a matter relevant to damages, not to liability. In any event, the effect of the two statements are not analogous. The court takes judicial notice of the fact that any violations of human rights that may have occurred in South Rhodesia are not nearly as well-known as those that occurred in South Africa. Furthermore, a review of the historical materials submitted by defendants indicates that substantial differences existed between the two countries.[6]

4. There is some intellectual force to the distinction drawn by defendants between the fact that one was an employee of a government and the conclusion that one supports its practices and policies. It is not, however, a distinction that has attracted any significant attention in the law. One might, for example, contend that the statement "Johnson works for the Communist Party" implies directly that Johnson is employed by the Communist Party, but only indirectly (or, as it is commonly stated, through innuendo) implies that Johnson supports the policies and practices of the Communist Party. Conceivably, the impact of a statement that contains both implications is more damaging than a statement that implies only the former. In practice, however, the courts have not focused on this distinction and have instead considered only the questions of whether the statement taken as a whole has a defamatory meaning and whether that meaning is defamatory per se and hence actionable without proof of special damages. *See, e.g., Washburn v. Wright*, 261 Cal.App.2d 789, 68 Cal.Rptr. 224 (1968).

5. The court may take judicial notice of this fact under Fed.R.Evid. 201 since it is not subject to reasonable dispute and is generally known within the district of the trial court.

6. Defendants, by their submission of several reference works from the 1970s, seem to believe that the court should compare the effect of a false allegation that Partington was a prosecutor in South Africa with the effect of the truthful statement that he was a prosecutor in South Rhodesia as it would have been understood during the 1970s, the decade during which he apparently was employed there. The relevant inquiry is what the effect of the statement was in 1992 when it was published by the book defendants. Since in 1980, at the end of a seven-year civil war, South Rhodesia (renamed Zimbabwe) achieved "internationally recognized independence under a government controlled by its black majority," *Collier's Encyclopedia* at 52 (1992), Exhibit G to *Book Defendants' Memorandum in Support of Motion to Dismiss*, the effect of a statement that someone was a prosecutor in Rhodesia after 1980 would be considerably less damaging than the same statement made during the preceding decade.

Even in the 1970s, Africans were able to register and vote, though a two-roll system of voting

Defendants' contention that the sting of the two statements is essentially the same is thus without merit.

## B

Having affirmatively resolved the issue of whether the statement can reasonably sustain the meaning alleged by plaintiff, the next question is whether the meaning itself is libelous per se and hence actionable without allegation of special damages. If it is not, the court must consider the additional question of whether Partington has adequately plead special damages.[7]

Under Hawaii law, the following classes of libel are libels per se:

(1) Libels which impute to a person the commission of a crime.

(2) Libels which have a tendency to injure him in his office, profession, calling or trade.

(3) Libels which hold him up to scorn and ridicule and to feelings of contempt or execration, impair him in the enjoyment of society and injure those imperfect rights of friendly intercourse and mutual benevolence which man has with respect to man.

*Butler v. United States,* 365 F.Supp. 1035, 1044 (D.Haw.1973). *See also Russell v. Am. Guild of Variety Artists,* 53 Haw. 456, 497 P.2d 40 (1972); *Kahanamoku v. Advertiser,* 25 Haw. 701 (1920).[8] The statement in question implicates the second and third classes of libel per se.

A false charge that someone works for the South African government is analogous to a false charge that an individual worked for, or sympathized with, the Communist Party. Under Hawaii law, a false charge that an individual is a Communist or a Communist sympathizer is libelous per se. *Cahill v. Haw'n Paradise Park Corp.,* 56 Haw. 522, 527, 543 P.2d 1356 (1977).[9]

In light of the well-publicized human rights violations committed by the South African government that have continued until recent years, the charge against Partington is damaging against him both in his profession [10]

---

maintained distinctions between the Europeans and the African majority. *Id.* While hardly a model liberal democracy, significant differences have long existed between Rhodesia and South Africa.

7. Defendants contend that Partington's reputation is so badly tarnished by his participation in the Clarke case that he is "libel-proof" since a defamatory remark could not conceivably cause any additional damage to his estimation in the community. "A plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by allegedly false statements on that subject." *Guccione v. Hustler Magazine,* 800 F.2d 298, 303 (2d Cir. 1986). Nonetheless, the conclusion urged by defendants is inappropriate since it is inapposite on the record before the court. While defendants have offered some evidence that Partington's participation in the Clarke case caused him to suffer from negative publicity, *see* Exhibit B to Book Defendants' Memorandum in Support of Motion to Dismiss, they have hardly shown that Partington's reputation has been reduced to a level where he is libel-proof. This is especially true in light of the fact that all inferences from the facts must be drawn in favor of Partington at this stage of the proceeding. *T.W. Elec.,* 809 F.2d at 631.

8. In making a distinction between libels and libels per se, Hawaii appears to depart from the generally accepted principle that written defamatory statements are actionable without proof of

special damages. *See* S. Speiser, et al., *The American Law of Torts* (1991), § 29:56. We need not address this issue in detail since the parties have proceeded on the basis that this departure is well supported and because, as is discussed below, the statement is libelous per se under Hawaii law and hence not relevant to the outcome of the case.

9. Defendants' reliance on *Washburn v. Wright,* 261 Cal.App.2d at 789, 68 Cal.Rptr. 224 is curiously misplaced. Defendants cite *Washburn* for the proposition that membership in an extremist organization is not defamatory per se. While that proposition is certainly true, the holding in *Washburn,* that a false accusation of membership in the John Birch Society was not libelous per se, was based on the court's conclusion that the John Birch Society was known for combating communism, which "was commonly believed at the time to be a dangerous and illegal conspiracy." *Id.* 68 Cal.Rptr. at 230. The false statement made against Partington is more akin, though certainly not the same, to a false charge of membership in the Ku Klux Klan which the *Washburn* court indicated would be defamatory per se. *Id.*

10. Accusations against an attorney of membership in a politically unpopular group have generally been held to be defamatory per se. S. Speiser, et al., *The American Law of Torts* (1991), § 29:71.

and in the community at large. The statement is thus libelous per se and no special damages need be alleged.

## C

The remaining issue with respect to Count I is whether Partington is a public figure. If he is, the court must consider the additional question of whether he has adequately plead actual malice.

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court recognized that some traditional common law actions for defamation interfered with First Amendment rights of free expression. On the basis of its conclusion that the First Amendment recognizes that writers and speakers need to be given enough "breathing space" to avoid self-censorship and to encourage "debate on public issues [that is] uninhibited, robust, and wide open," *Id.* at 270, 84 S.Ct. at 720, the Court held that a public official could recover damages for libel only by showing that the allegedly defamatory statement was made with " 'actual malice'—that is, with knowledge that the statement was false or with reckless disregard of its truth." *Id.* at 279–80, 84 S.Ct. at 725–26.

In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), this constitutional protection was applied to speech concerning public figures who were not government officials, but who nonetheless "often play an influential role in ordering society." *Id.* 376 U.S. at 264, 84 S.Ct. at 717.

■■■ The actual malice rule does not extend to speech about private individuals. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court held that the extent of the constitutional privilege varies with the strength of the government's legitimate interest in protecting individual reputation. This interest is strongest when the state protects private citizens whose actions reflect a decision to shield their lives from public scrutiny and since such private individuals are typically "more vulnerable to injury than public officials and public figures [and] more deserving of recovery." *Id.* at 345, 94 S.Ct. at 3009.

The state's interest is weaker with respect to government officials and others who individually assume a "role of especial prominence in the affairs of society ... [that] invite[s] attention and comment." *Id.*

This is partly true because public figures "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.* at 344, 94 S.Ct. at 3009. It is also true because the public has a legitimate interest in the conduct of public officials, and in the freedom of the press to engage in the uninhibited debate about their involvement in public issues and events. *Butts*, 388 U.S. at 164, 87 S.Ct. at 1996. (Warren, C.J., concurring).

■■■ There are two classes of public figures that have been identified by the Supreme Court: general purpose and limited purpose public figures. "In some instances, an individual may achieve such fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351, 94 S.Ct. at 3012. The extent of the individual's participation in public affairs and assumption of the risk of adverse publicity determines the weight of the government's interest in protecting his or her reputation. *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C.Cir.1987).

■■■ Whether, and for what purposes, a person is a public figure is a matter of law for the court to decide. *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Unfortunately, determining precisely what individuals are public officials is an uncertain practice and is not readily susceptible to the application of mechanical rules. *See, e.g., Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440, 443 (S.D.Ga.1976), *aff'd*, 580 F.2d 859 (5th Cir.1978). ("Defining public figure is much like trying to nail a jellyfish to the wall.")

■■■ Defendants argue that Partington is a general purpose public figure "be-

cause of his constant thirst to seek the public spotlight." *Book Defendants' Reply Memorandum In Support of Motion to Dismiss* at 2 (note 3). Generally speaking, a person becomes a general purpose public figure only if he or she is a well-known celebrity; that is, if his name is a household word. *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1293, n. 12 (D.C.Cir.1980); *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). Such persons knowingly relinquish their anonymity in return for fame or fortune. It is thus reasonable "to attribute a public character to all aspects of their lives." *Tavoulareas,* 817 F.2d at 772.

Though Earle Partington is an attorney of some notoriety in the Honolulu community, his celebrity does not nearly approach that of a well-known athlete, entertainer, or politician—the archetypes of the general purpose public figure. *See, e.g. [Johnny] Carson v. Allied News Co.,* 529 F.2d 206 (7th Cir.1976); *Chuy v. Philadelphia Eagles Football Club,* 431 F.Supp. 254 (E.D.Pa.1977), *aff'd,* 595 F.2d 1265 (3d Cir.1979) (en banc). Since the standard applied to determining whether a person is a general purpose public figure is so strict, the court has no difficulty in concluding that Partington is not a general purpose public figure.

The issue is somewhat less clear with respect to Partington's status as a limited purpose public figure. *Gertz* establishes a two-part analysis to determine whether an individual is a limited purpose public figure. First, does a public controversy exist? Second, what was the "nature and extent of [the] individual's participation" in the public controversy? 418 U.S. at 352, 94 S.Ct. at 3013.

Three factors determine the "nature and extent" of an individual's involvement in a public controversy: The extent to which participation in it is voluntary, the extent to which there is access to channels of effective communication in order to counteract false statements, and the prominence of the role played in the public controversy. 418 U.S. at 344–45, 94 S.Ct. at 3009–10. Precisely what is a public controversy has not been clearly decided by the Supreme Court. It's well-established that not all matters of general or public interest are public controversies as

contemplated by *Gertz.* For example, "dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz*." *Time, Inc. v. Firestone,* 424 U.S. 448, 455, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). Several factors, however, lead to the conclusion that Buck Walker's trial was in fact the sort of public controversy referred to in *Gertz.* The murder trial generated widespread local and national press and attracted public attention for over a decade as the media sought to unravel precisely what happened on Palmyra Island.

The first factor in determining the nature and extent of Partington's involvement in the controversy is the prominence of his role in the trial. Since Partington was the lead counsel for the defense, he clearly played a prominent role in the public controversy.

The second part of the test of public figure status is also satisfied. Partington had "access to the channels of effective communication and hence . . . a . . . realistic opportunity to counteract false statements." *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009. The evidence indicates that Partington regularly gave interviews to the media and was effectively able to broadcast his view of the trial to the public.

The most troublesome issue is whether Partington voluntarily thrust himself into the forefront of the public controversy. Partington argues that it cannot be the case that an attorney necessarily injects himself into a criminal prosecution when he is appointed to represent an indigent client. There is some authority for that proposition. *See, e.g., Peisner v. Detroit Free Press,* 82 Mich.App. 153, 266 N.W.2d 693 (1978) (attorney appointed to handle criminal appeal not public figure); *Spence v. Flynt,* 816 P.2d 771, 776 (Wyo.1991) ("A professional person, who may be a 'public figure' for some purposes, should be free to offer his services to a client as a private professional without being subject to public figure defamation.").

The court need not address this issue, however, since it is inapposite on the record. The evidence here shows that Partington's involvement in the case went far beyond the low-key participation one might expect of

someone attempting to avoid the public eye. He actively sought exposure to the media and voluntarily maintained a high profile throughout the trial. *See* Exhibit C to Book Defendants' Memorandum In Support of Motion to Dismiss. Partington might forcefully contend, though he has not, that his contact with the media was necessary for the vigorous defense of his client. It appears on the record that Partington's conduct rose beyond this level as well. Partington voluntarily engaged in a course of action with respect to the trial that was bound to invite attention and comment. Accordingly, he was a public figure for the purpose of the Walker trial.

 Summary judgment is nonetheless inappropriate because Partington has adequately alleged actual malice on the part of Bugliosi. The complaint states that the false statement in Count I "was made with intent, malice, and fault in that Bugliosi intended to make Partington look bad in the eyes of the public and other third parties." *Complaint* at ¶ 39.

The issue is more problematic with respect to the remaining defendants since Partington has alleged only that "[t]he defendants had numerous opportunities to determine the truth or falsity of the statement, but did not do so." *Complaint* at ¶ 40. The actual malice standard requires a showing of subjective fault. A plaintiff must show either that a defendant "realized that his statement was false" or that he "subjectively entertained serious doubts as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949,

1965 n. 30, 80 L.Ed.2d 502 (1984). Objective negligence—an allegation that a defendant should have known or foreseen that a statement was false—is not actionable against a public figure. *Newton v. National Broadcasting Corp.*, 930 F.2d 662, 680–87 (9th Cir. 1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 192, 116 L.Ed.2d 152 (1991).

Summary judgment is accordingly denied on Count I with respect to Bugliosi and granted with respect to all other defendants with leave for Partington to amend his complaint within thirty days to allege actual malice on the part of the remaining defendants, if he can do so consistent with the requirements of Fed.R.Civ.P. 11.

3. Count II—"Had Walker's defense lawyers not read the theft trial transcript?"

 Partington's second allegation is that the book defendants defamed him by falsely implying that he (and Findlay) had failed to read the transcripts of the earlier theft trial. This statement, found at pages 232–233 of the book, concerns the direct examination of a witness who had had radio communications with Mac Graham while Mac Graham was on Palmyra Island.[11]

Partington contends that the last two sentences of this passage defame him by creating "the innuendo that [he] never localized, utilized and/or read the theft-trial transcripts and therefore was an incompetent and ineffective attorney." *Complaint* at ¶ 50. The implication of this statement, Partington says, is "that he lacks the ability necessary

---

11. The complete passage reads as follows:

"Do you recall if the subject of your last conversation with Mac Graham on August 28th ever turned to something that was then taking place?" Schroder asked.

"Well, towards the end of this contact, I could hear a voice in the distance. Then Mac said, 'Wait a minute. Something is going on.' So he went up topside and he came back and said, 'There is a dinghy coming over to the boat.' And his comment was, 'I guess they've made a truce,' or something like that. Then he told me to hang on while he went topside again."

"Did he return to the radio?"

"Yes, he did," Shoemaker said. "He came back in maybe ten or fifteen seconds and *said something about their bringing a cake over.*

And he said, 'I better find out what's happening.' Mac signed off at that point."

"Did you hear anything in the background while Mac was telling you about these events?"

"Yes. I heard a woman's voice, and there was laughter, and I believe Muff was talking, too. It sounded like two females' voices."

From my review of the transcripts of the two theft trials, I knew that Shoemaker [the radio operator], with every opportunity to do so, had never mentioned anything about a cake or a truce in his earlier testimony. Incredibly, Findlay, in his brief cross-examination, did not bring out this critical contradiction. Had Walker's defense lawyers not *read* the theft-trial transcripts? Our copy had ended up in a warehouse; perhaps theirs had too.

Complaint at ¶ 45 (emphasis in complaint).

for the proper practice of law and/or [that he] inadequately conducts his profession." *Complaint* at ¶ 51.

Defendants contend, as in Count I, that the statement is not defamatory, that Partington has inadequately alleged actual malice, and that he has not made a necessary allegation of special damages. Defendants also contend that the statement is protected as opinion or fact comment. Because the court finds that final issue to be dispositive it need not address the former three.

Ordinarily, the court should first determine whether the statement is actionable under Hawaii law, and only then refer to any constitutional protections for statements of opinions versus fact. *See, e.g., Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909). Two factors foreclose that course. First, a review of Hawaii law reveals a dearth of case law on the distinction between statements of fact and expressions of opinion. Second, the Ninth Circuit has held that the fact versus opinion distinction in defamation cases is mandated by *Gertz*, and in diversity cases has decided the issue as a question of federal law. *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir.1987); *Lewis v. Time, Inc.*, 710 F.2d 549, 553 (9th Cir.1983). Accordingly, the court considers the issue in light of federal law.

It is a well-established principle that "statements not themselves factual, and which do not suggest that a conclusion is being drawn from facts not disclosed in the statement, are commonly statements of opinion, not fact." *Koch*, 817 F.2d at 509. *See Restatement (Second) of Torts*, § 566 (1977). The most recent Supreme Court case to consider this issue, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), did nothing to alter this principle.

In *Milkovich*, an Ohio high school student sued a local newspaper for implying that he had lied in a disciplinary proceeding in order to participate in an upcoming wrestling meet.[12] The Court stated that *Gertz* was not intended "to create a wholesale defamation exception for anything that might be labeled "opinion" since that would create the undesirable result that a writer could escape liability for accusations of defamatory conduct simply by stating, or implying, the words "I think." *Id.* at 18–19, 110 S.Ct. at 2705–06. *See also Cianci v. New Times Publishing Co.*, 639 F.2d 54, 61 (2d Cir.1980). The relevant inquiry as framed by the Court was whether a statement could " 'reasonably be interpreted as stating actual facts about an individual.'" *Milkovich*, 497 U.S. at 20, 110 S.Ct. at 2706 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988)). Thus the spoken statement, "In my opinion John is a liar," is actionable slander since it "implies a knowledge of facts which lead to the conclusion that Jones told an untruth." *Milkovich*, 497 U.S. at 18, 110 S.Ct. at 2705. None of these statements represent a departure from established Ninth Circuit law which has never carved a blanket exception for statements of opinion.

The Ninth Circuit employs the following three-factor test in evaluating whether a writing is a statement of fact or an expression of opinion:

> (1) whether the words can be understood in a defamatory sense in light of the facts surrounding the publication, including the medium by which and the audience to which the statement is disseminated; (2) whether the context in which the statements were made, *e.g.*, public debate or a labor dispute, would lead the audience to anticipate persuasive speech such as "epithets, fiery rhetoric or hyperbole"; and (3) whether the language used is the kind generated in a "spirited legal dispute."

*Leidholdt v. L.F.P., Inc.*, 860 F.2d 890, 894 (9th Cir.1988) (quoting *Ault v. Hustler Magazine, Inc.*, 860 F.2d 877, 884 (9th Cir.1988)). The court must also ask the basic question of whether the statement could be reasonably

---

12. The complete statement to which Milkovich objected read as follows:

Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott [the district superintendent] lied at the hearing after each having given his solemn oath to tell the truth.

*Milkovich*, 497 U.S. at 5, 110 S.Ct. at 2698.

understood as stating actual facts about the plaintiff. *See Milkovich*, 497 U.S. at 20, 110 S.Ct. at 2706; *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1193 (9th Cir.1989).

Each of these factors lead to the conclusion that the statement in question here was a privileged expression of opinion and not a statement of. fact. . Standing alone, a statement such as "in my opinion, Walker's defense attorney's had not read the trial transcript," like the statement, "in my opinion John is a liar," might be defamatory since it could reasonably be interpreted as implying that there are facts known to the author that cause him to form such an opinion. Here, however, Bugliosi and Henderson reveal the factual bases of their opinion (none of which are contested by Partington). It is thus clear to the reader that Bugliosi and Henderson do not know whether Findlay and Partington actually read the theft-trial transcripts and that the authors do not have any reasons, beyond the excerpted trial testimony, for thinking that they did not.[13] Since the authors make clear the point at which they run out of facts and are simply guessing, the statement, taken in context, cannot reasonably be interpreted as implying an assertion of fact.

The additional three-factor test employed by the Ninth Circuit supports this result as well. Because the book is of the sort that appeals to educated readers, most of whom presumably purchase the book at least partially for the purpose of being enlightened by Vincent Bugliosi's insights into a particular legal exchange, it telegraphs to the reader that the book presents opinions as well as facts. Furthermore, the context of the statement, comment on attorney strategy during a criminal case, is such that leads the audience to anticipate pointed rhetorical statements.

For all of these reasons, the court grants summary judgment in favor of all defendants on Count II.[14]

### 4. Count III—False light for statement in Count II

In Count III, Partington alleges that passage at issue in Count II casts him in a false light. Defendants contend that the statement did not place Partington in a false light and that, in any event, the tort of false light is not recognized in Hawaii law.[15] They also allege that Partington failed to allege special damages and actual malice, and that the statement is a privileged expression of opinion rather than a statement of fact.

False light is a species of the tort genus of invasion of privacy. W. Keeton, *et al., Prosser & Keeton on Torts*, § 117 (5th ed. 1984). It derives from giving publicity to a matter which places a plaintiff in a false light in the public eye. *Id.* at 863–65. The *Restatement (Second) of Torts*, § 652 E (1977) defines the tort as follows:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if:

13. Justice Brennan, dissenting in *Milkovich*, notes that the *Restatement (Second) of Torts* § 566, Comment c (1977) makes a similar distinction. The Restatement explains that a statement that "I think C must be an alcoholic" is potentially libelous because a jury might find that the statement implies that the speaker knew undisclosed supporting facts. In contrast, the Restatement finds that the following statement could not be found to imply any defamatory facts:

A writes to B about his neighbor C: 'He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic.'

"... [C]lear disclosure of a comment's factual predicate precludes a finding that the comment implies other defamatory facts ..." *Milkovich*, 497 U.S. at 27, n. 3, 110 S.Ct. at 2710, n. 3 (Brennan, J., dissenting).

14. The court need not address the second part of the statement, "Our copy had ended up in a warehouse; perhaps theirs had too," since the statement is not defamatory. It cannot reasonably be understood as ascribing fault to Partington.

15. As noted above, Partington has moved the court in a separate motion to certify the question of whether the tort of false light is actionable under Hawaii law to the Hawaii Supreme Court. *See infra* at 925.

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Defendants note with considerable force that there is some inequity in allowing a plaintiff who has alleged defamation to proceed on duplicitous counts of libel and false light. Some courts have dismissed such claims of false light on the theory that the defamation action provides a complete remedy for damages a plaintiff may have suffered. *See, e.g. Selleck v. Globe International, Inc.,* 212 Cal.Rptr. 838, 847, 166 Cal.App.3d 1123 (1985); *Kapellas v. Kofman,* 1 Cal.3d 20, 35, n. 16, 81 Cal.Rptr. 360, 459 P.2d 912 (1969). *But see Restatement (Second) of Torts,* § 652E, Comment ("In many cases to which the rule stated here [for false light] applies, the publicity given to the plaintiff is defamatory, so that he would have an action for libel or slander. . . . In such a case the action for invasion of privacy will afford an alternative or additional remedy, and the plaintiff can proceed under either theory, or both, although he can have but one recovery for a single instance of publicity.")

The court need not address this question, however, because Partington has failed to make out a viable claim of false light. Since the statement is an expression of opinion rather than an assertion of fact, it cannot be said to place Partington in a false light that would be highly offensive to a reasonable person. An attorney in a highly publicized criminal trial cannot reasonably expect to be free from criticism of his strategy and conduct. *See, e.g., Quilici v. Second Amendment Foundation,* 769 F.2d 414, 417–18 (7th Cir.1985) (An attorney "must be willing to accept the criticism that inevitably, in the course of a career, will follow."). Furthermore, since expressions of opinion are constitutionally privileged they cannot form the basis of a claim of invasion of privacy by placing a person in a false light. *Ault v. Hustler Magazine, Inc.,* 860 F.2d 877, 880 (9th Cir.1988); *Time, Inc. v. Hill,* 385 U.S. 374, 387–88, 87 S.Ct. 534, 541–42, 17 L.Ed.2d 456 (1967). Accordingly, summary judgment must be granted in favor of all defendants on Count III of the complaint.

5. Count IV: "Steers being led to the slaughterhouse"

■ Count IV concerns Bugliosi and Henderson's statement that Partington (and Findlay) "stuck with their submissive stance [during the Walker trial] not unlike steers being led to the slaughterhouse."[16] Partington contends that this statement cast him in a false light by creating the false impression

---

16. The complete passage, at pages 234–35 of the book reads as follows:

Trials never proceed swiftly, except in novels or the movies, and during the ensuing days, a long line of additional prosecution witnesses dutifully took the stand.

The defense's [Partington's and Findlay's] cross-examination of these witnesses was consistently uninspiring, failing, for the most part, to make any dent in the witnesses' version of events. The mediocre performance of the defense attorneys was hardly enhanced by King's continuing assault upon their competence in open court. Remarks like, "You are wasting a lot of time," "Stop this nonsense and go on to another question," and "Now, move on" found their way into his splenetic repertoire.

During a recess, one of the newspaper reporters covering the trial approached Findlay in the hallway.

"He's a peppery judge," the reporter said.

"The judge is so bad, it's unbelievable," snapped a disgusted Findlay, making no effort to keep his comments off the record. "It's more than his demeanor. His prejudice against our side goes to substantive issues."

I knew that King's conduct would likely influence the jury against Walker, since it would be a small step for a lay person to reason that a judge who treated the prosecutors with collegial respect and the defense with such disdain must not like *the cause the defense attorneys were representing.* But Partington and Findlay stuck with their submissive stance, not unlike steers being led to the slaughterhouse.

It was obvious that King was like a loose cannon on the bench, unmindful of the prejudicial effect to the defendant his outbursts in court would have on the jury.

I hadn't decided how yet, but I already knew I would have to come up with some way to help insure that King acted much differently during Jennifer's trial. If I had anything to say about it, I wouldn't even countenance *one* such outburst, much less the steady stream of them Walker's attorneys endured.

Complaint at ¶ 72 (emphasis in complaint).

that he is "a weak and spineless lawyer without the fortitude to take on a judge or the skills or courage to adequately and competently represent a client." *Complaint* at ¶ 73.

This statement is logically divided into two component parts. The first is the statement that the defense lawyers took (and stuck with) a submissive stance during the trial. Partington does not contest the fact that he took a submissive stance before the judge. Rather, he argues that Bugliosi and Henderson negligently failed to state the fact that the decision to take a submissive stance was that of his client, Walker. *See Complaint* at ¶ 74. ("... Bugliosi knew or should have known that Partington was required to abide by the defense decisions of his client, Walker, which decisions and strategies included taking a 'submissive' stance vis a vis the judge."). As such, the first part of the statement cannot sustain a claim for false light since Partington has failed to allege that that part of the statement is false. Additionally, though defendants have not raised this argument, the statement is not one that would be *highly* offensive to a reasonable person.

The second part of the statement is somewhat more problematic, though it too is not actionable. This is because, taken in context, the statement could not be "interpreted as implying that there are facts known to the author that cause him to form such an opinion." *Supra* at 920. As with Count II, Bugliosi and Henderson set forth the facts upon which they apparently rely in reaching their opinion that Partington and Findlay behaved as steers being led to the slaughterhouse.

The difference here is that Bugliosi and Henderson failed to disclose that Partington was acting at his client's direction, as Partington contends is the case. Presumably, the effect of this disclosure would be to make the author's conclusion somewhat less reasonable and the defense lawyers' behavior more understandable. Nonetheless, it is a difference

of no moment since the statement is still a privileged expression of opinion.

Consider again, the statement discussed above, "I think John is an alcoholic." The statement is actionable by itself since it implies knowledge of defamatory facts that form the basis of the opinion. A different result obtains if the statement is preceded by the disclosure of supporting facts. For example, "John's father is an alcoholic. John looks just like his father. I think John is an alcoholic too." While the first statement is factual and defamatory and may support an action by John's father, the second is not since it can only reasonably be interpreted in context as a (ridiculous) conclusion based on the preceding facts. Partington would contend nonetheless that the statement is defamatory if the speaker was aware of any statements that might undermine the validity of his conclusion; for example, "John regularly attends church." He argues, in effect, that the court should recognize false light by omission.

Partington's argument is without merit. Partington does not cite, and the court cannot find, any legal authority for his proposition which is equally inapplicable in the context of false light. In any event, the statement is protected as a privileged expression of opinion. The authors' state of mind, while relevant to the inquiry as to actual malice, is irrelevant to the question of whether the statement could reasonably be interpreted as stating actual facts about an individual. Taken in context, the statement could not.

For all of these reasons, the court grants summary judgment in favor of all defendants on Count IV.

6. Counts V and VI—"The Walker jury had never heard this fact."

 Counts V and VI set forth claims for defamation and for false light arising from a statement in the book that several diary entries, showing that there had been repeated contact among Stearns, Walker, and the Grahams, had not been introduced at the Walker murder trial.[17] Partington contends that the

---

17. The complete passage is found at pages 408–409 of the book where Bugliosi recounts the

direct testimony of Stearns during her murder trial:

statement is defamatory because it "creates the inducement [sic] that Partington should have offered the diary entries into evidence at Walker's trial." *Complaint* at ¶ 89. He also contends that the statement creates the innuendo that he does not conduct his profession competently.

Partington concedes that the statement is truthful, but again seeks recovery on the failure of the authors to include the exculpatory fact that Stearns' diary was inadmissable at the Walker trial. Since the statement is a truthful statement of fact, Partington may not recover for defamation. *Beamer v. Nishiki,* 66 Haw. 572, 670 P.2d 1264 (1983); *Herbert v. Lando,* 441 U.S. 153, 176, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979). *See generally Restatement (Second) of Torts,* § 558 ("[T]o create liability for defamation there must be ... a false and defamatory statement concerning another."

Furthermore, when taken in context, it is clear that the "fact" to which the statement is referring is that there was considerable

contact among Walker, Stearns, and the Grahams, not the specific failure of Partington to introduce Stearns' diary into evidence. As such, the words are not reasonably susceptible of a defamatory interpretation. *Tagawa v. Maui Publishing Co.,* 50 Haw. 648, 675, 448 P.2d 337 (1967). Nor can they be considered highly offensive to a reasonable person and hence supportive of a claim for false light. Accordingly, the court grants summary judgment in favor of all defendants on Counts V and VI of the complaint.

### 7. Count VII—"Plausible, except for the inconvenience of fact ..."

Count VII sets forth a claim for false light arising from a comment by the authors on Partington's explanation for why he declined to call J.W. Williams, a prison mate of Walker who had allegedly heard Walker make some incriminating statements, as a witness. The authors call Partington's explanation "[p]lausible, except for the inconvenience of fact." [18] Partington claims that the innuendo

---

I had Jennifer read aloud a diary entry that involved a social evening Buck and Jennifer had spent aboard the *Sea Wind* on July 9. " 'On our way to bathe took some coconut butter to Mac and Muff. Never got to bathe but had a very enjoyable evening with them, drinking wine, which tasted fine. And then some rum which was a bit too much for me on an empty stomach. Got pretty drunk—smoked two cigarettes. Mac had given R some Bull Durham earlier in the day. Then gave him a pack of some other cigarettes. He has a friend for life now.' "

"Jennifer, you've heard testimony from prosecution witnesses that they never saw you and Buck on the *Sea Wind?*"

"Yes."

"From where your boat and the other boats were moored at the dolphins, could one see the *Sea Wind?*"

"No."

"And why is that?"

"The *Sea Wind*—Mac had backed it into this little cove [as I had her indicate on the chart of the island]. And it was totally horseshoed by land. And there was a little jut of land that came out helping to form the cove. So, there was no line-of-sight vision."

"Did this portion of Cooper Island jutting out into the lagoon have heavy vegetation and tall trees on it?" I asked.

"Yes."

"She estimated the distance between the *Iola* and *Sea Wind* as two hundred yards."

Between July 6 and August 26, there were a total of twenty-three entries concerning Jenni-

fer's and Buck's contacts with the Grahams. I had Jennifer read each one to the jury.

"The contact, then, between and among the four of you was of a considerable nature? Is that correct?"

"Yes."

*The Walker jury had never heard this fact. Complaint* at ¶ 88 (emphasis in complaint).

18. The complete passage is set forth at page 239 of the book:

While Enoki [the prosecutor] still declines to say why he didn't call Williams to testify, Earle Partington is not so reticent. He claims that when the FBI first visited Williams in prison, the agents *showed* him Ingman's FBI 302 report that outlined Ingman's version of Walker's prison confession, and asked Williams if he could corroborate it. Says Partington: "Williams told them he'd have to think about it. He subsequently wrote to Walker in Prison and told him about the FBI's visit. Unbeknownst to me, Walker and Williams then concocted a scheme whereby Williams agreed to fabricate a story for the FBI similar to Ingman's, get himself called as a Government witness, and, on the stand, refute what he's told the FBI, saying he'd gone along with the FBI because they had offered him such a good deal. Williams would then testify that Walker had made no statements about the Grahams or what had happened to them. Walker and Williams thought this would discredit Ingman's testimony, making it look as if Ingman, too, was most likely going along with what the

of the statement is that he is "a liar and/or an incompetent attorney." *Complaint* at ¶ 111.

Partington states that "the published statement that Williams could not have been confronted with Ingman's statement because the FBI 302 report had not then been transcribed is false since Williams was told of Ingman's statement, not shown them, a fact that was known or [irrelevantly] should have been known by Bugliosi." *Complaint* at ¶ 110. This is an exceedingly odd claim since it is apparently based on an accurate representation of a comment Partington made to Bruce Henderson in one of several interviews that Partington volunteered to conduct. *See, e.g.,* Exhibit K to Book Defendants' *Supplemental Memorandum in Support of Motion to Dismiss.*

In any event, the statement is a paradigmatic example of protected opinion. The statement clearly sets forth the facts upon which it relies and clearly indicates the point where the authors run out of facts and are simply expressing their own views. It cannot be reasonably understood as stating an actual fact about the plaintiff. *Milkovich,* 497 U.S. at 20, 110 S.Ct. at 2706. Since the statement is substantially true, and a privileged expression of opinion to the degree that it is not, it cannot sustain a claim for false light. Accordingly, the court grants summary judgment in favor of all defendants as to Count VII.

8. Counts VIII and IX—"If I defend you the way Partington is defending Walker, you'll spend the rest of your life in prison."

█ In Counts VIII and IX, Partington alleges that the defendants defamed him and cast him in a false light by including the following statement in the script of the television miniseries: "If I defend you [Stearns] the way Partington is defending Walker, you'll spend the rest of your life in prison." Partington again complains that the effect of the statement is to make him appear to be a "liar and/or an incompetent attorney." *Complaint* at ¶ 127. Partington adds that "Bugliosi was aware that Partington's defense strategy of challenging the government's contention that a murder had occurred was the only reasonable defense strategy available for Walker." *Complaint* at ¶ 122.

Partington does not allege that the statement is in the book. Nor does he allege that either Bugliosi or Henderson had anything to do with the writing of the script for the television miniseries. Accordingly, there is no basis of liability for the book defendants and Counts VIII and IX must be dismissed against them.

Counts VIII and IX fail to set forth a valid claim against the television defendants as well because the statement is a privileged expression of opinion under *Milkovich.* This is so for two reasons.

First, the statement is absolutely protected under *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), since it is a statement on a matter of public concern that cannot be proven as false. *See Milkovich,* 497 U.S. at 19–20, 110 S.Ct. at 2706–07 ("... *Hepps* stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law ...").

Second, even if the statement is not absolutely protected, it cannot reasonably be interpreted as stating actual facts about Partington. Partington's contention that the

---

FBI wanted him to say. Williams, in fact, did tell the FBI a fabricated story on October 9, 1984, but Enoki, I think, suspected an ambush and decided against calling Williams. Ray Findlay and I briefly discussed calling Williams as a defense witness, but decided against it. With Williams telling two different stories—one to the grand jury and FBI, and another to the trial jury—we couldn't count on which story the jury would end up believing."

Plausible, except for the inconvenience of fact. The FBI interviewed Ingman on October 5, 1984, but the 302 report of that interview wasn't transcribed by an agency clerk until October 17, eight days *after* the FBI's *second interview* with Williams on October 9, 1984, during which he recounted Walker's "walk the plank" story. Williams may indeed have decided at a later date to refute his story on the stand, but it seems apparent that his crony Walker *did tell* the sadistic tale, true or not, to both Ingman and Williams at McNeil Island Prison.

*Complaint* at ¶ 109 (emphasis in complaint).

statement implies that he is an incompetent attorney is unreasonable in light of the context of the statement. It is most plausibly understood as a dramatization of an attempt by Bugliosi to convince Stearns of the wisdom of his proposed trial strategy. If the statement implies any criticism of Partington at all it relates solely to Partington's trial tactics and not to his competence as an attorney. The instant statement like the statements "Judge Jones often makes erroneous rulings" and "Attorney Alfred blew the case" are not actionable because attorneys and judges alike are not immune from such statements that do not imply underlying defamatory facts. Criticisms of trial strategy make no such implication.

Finally, *Leidholdt* requires the court to consider "whether the words can be understood in a defamatory sense in light of the facts surrounding the publication, including the medium by which ... the statement is disseminated." *Leidholdt*, 860 F.2d at 894. Television miniseries, or docudramas as they are sometimes called, are widely recognized as dramatizations of historical events that frequently take considerable liberties with the truth. This context is one that leads the audience to anticipate hyperbole as contemplated by the second factor of the *Leidholdt* test.

For all of these reasons, the statement could not be reasonably understood as stating actual facts about the plaintiff. Summary judgment is accordingly granted in favor of all defendants with respect to Counts VIII and IX.

**C. Plaintiff's Motion to Amend Complaint**

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires." The Ninth Circuit has stated:

> While a district court's action on a motion for leave to amend should be reversed only if the action is an abuse of discretion, there is a strong policy to permit the amending of pleadings, *Howley v. United States*, 481 F.2d 1187, 1190 (9th Cir.1973), and denial of a motion to amend must be viewed strictly. *Klamath–Lake [Pharmaceutical Assn. v. Klamath Medical Serv.*

*Bureau* ], 701 F.2d 1276, 1292 (9th Cir. 1982). We have noted on several occasions, *see, e.g., Hurn [v. Retirement Fund Trust* ], 648 F.2d [1252, 1254 (9th Cir. 1981) ], that the "Supreme Court has instructed the lower federal courts to heed carefully the command of Rule 15(a)· ... by freely granting leave to amend when justice so requires." *Howley* 481 F.2d at 1190.

*Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 765 (9th Cir.1986); *see also DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir.1987) (same discussion of Rule 15(a)).

When determining whether to grant a motion to amend, the Court should look to four factors: "bad faith, undue delay, prejudice to the opposing party, and futility of the amendment." *DCD Programs*, 833 F.2d at 186.

■ These factors balance strongly here in favor of Partington with respect to Count I. Leave to amend will not cause any undue delay or prejudice to the defendants who have brought this motion to dismiss at an early juncture in the litigation.

The factors balance against Partington with respect to the remaining counts. Since each of the statements complained of in Counts II through IX are privileged expressions of opinion, amendment would be futile with respect to these counts.

The motion is accordingly granted with respect to Count I and denied in all other respects. Plaintiff shall have thirty days from the date of entry of this order to amend his complaint with respect to Count I.

**D. Plaintiff's Motion for Certification of Question of Hawaii Law**

■ A question may be certified by a federal court to a state supreme court when it involves an important question of state law which is both unclear under state legal precedent and would be determinative in the instant case. *Richardson v. City and County of Honolulu*, 802 F.Supp. 326, 344 (D. Hawaii 1992); *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393–98, 108 S.Ct. 636, 643–46, 98 L.Ed.2d 782 (1988); *Bellotti v.*

*Baird,* 428 U.S. 132, 150–52, 96 S.Ct. 2857, 2867–68, 49 L.Ed.2d 844 (1976). This process is approved because it helps "save time, energy, and resources, and helps build a cooperative judicial federalism." *Lehman Bros. v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d .215 (1974).

Certification would further none of the above purposes in the instant case. Since Partington has not set forth a valid claim for false light, the question of whether Hawaii recognizes the tort of false light would not be determinative. Accordingly, the motion is denied.

## IV. Conclusion

For the reasons stated above, plaintiff's motion to amend complaint is GRANTED with respect to Count I and DENIED in all other respects. Plaintiff's motion to certify question of Hawaii law is DENIED. Defendants' motion to dismiss, which the court has treated as a motion for summary judgment, is GRANTED with respect to all defendants on Counts II, III, IV, V, VI, VII, VIII, and IX. Summary judgment is GRANTED with respect to all defendants except Bugliosi on Count I pending plaintiff's leave to amend his complaint to allege actual malice on the part of the remaining defendants. Defendants' motion for summary judgment is DENIED with respect to Bugliosi as to Count I.

IT IS SO ORDERED.